UNITED STATES of America, Plaintiff-Appellee,

v.

Larry D. BARNETTE, Leo J. Barnette, Allied Management Corporation, Jets Venture Capital Corporation, Thomas F. Gibbs, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Larry D. BARNETTE, Defendant-Appellant.

Nos. 84-3727, 84-3787.

United States Court of Appeals, Eleventh Circuit.

Oct. 8, 1986.

Charles W. Arnold, Jr., Jacksonville, Fla., for Larry D. Barnette, Allied Management Corp., Jets Venture Capital Corp. and Leo J. Barnette.

Aaron K. Bowden, Jacksonville, Fla., for TFG.

Robert S. Yerkes, Jacksonville, Fla., Terry A. Zitek, Asst. U.S. Atty., Tampa, Fla., for the U.S. in No. 84–3727.

Terry A. Zitek, Asst. U.S. Atty., Tampa, Fla., for the U.S. in No. 84–3787.

Before RONEY, Chief Judge, FAY, Circuit Judge, and SIMPSON, Senior Circuit Judge.

PER CURIAM:

On August 30, 1983 a federal grand jury returned an indictment against Larry D. Barnette ("Barnette"), Thomas F. Gibbs ("Gibbs"), Leo J. Barnette ("Leo Barnette"), Judge A. Causey ("Causey"), Murray Sentner ("Sentner"), Allied Management Corporation ("Allied") and Jets Venture Capital Corporation ("JVCC"). The defendants were charged with conspiracy to defraud the United States Army and Navy, the Department of Commerce, the Small Business Administration ("SBA") and the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 371. The defendants were also charged with mail fraud in violation of 18 U.S.C. § 1341, making false statements in violation of 18 U.S.C. § 1001, transportation of stolen property in violation of 18 U.S.C. § 2314, bribery of

public officials in violation of 18 U.S.C. § 201(b), misapplication of government funds in violation of 15 U.S.C. § 645 and tax offenses in violation of 26 U.S.C. § 7206(1). The indictment sought forfeiture from Barnette, Gibbs and Allied of their interests in several domestic and foreign corporations pursuant to the Racketeer Influenced and Corrupt Organizations act ("RICO"), 18 U.S.C. §§ 1961–1968.

Trial on the twenty-five count indictment began April 16, 1984, and continued for three months. The jury returned verdicts of guilty on various counts against Barnette, Gibbs, Leo Barnette, Allied and JVCC ("appellants").[1] Appellants challenge their convictions on a number of grounds. With the exception of the restitution ordered under Count 15 (bribery in violation of 18 U.S.C. § 201(b)), we find that appellants' contentions are without merit. We affirm the judgment of the district court but vacate the restitution order imposed as part of the sentence on Count 15.

## I.

### A. The Parties

Allied, a Delaware corporation established in 1969, set up its corporate headquarters in Jacksonville, Florida. J.E.T.S., Inc. ("J.E.T.S.") was a wholly owned subsidiary of Allied that performed government service contracts throughout the world. Barnette was the president and principal stockholder of Allied, and Gibbs was the vice president and a minority stockholder. Leo Barnette worked for JETS Waescherei GmbH, a wholly-owned subsidiary of J.E.T.S. formed to perform a laundry service contract in West Germany. Sentner was employed by the United States Army in Europe as an Army contracting officer. JVCC was a Florida corporation licensed and funded by the SBA to make loans to independent small businesses owned by socially or economically disadvantaged individuals pursuant to the Minority Enterprise Small Business Investment Companies ("MESBIC") program.

### B. Background

After World War II the United States Army constructed seven large laundries in West Germany. By 1975 the Army projected that a private contractor could perform the laundry services more efficiently and solicited bids from 75 companies. J.E.T.S., licensed to do business in West Germany as JETS Waescherei GmbH, submitted the lowest bid and was, therefore, awarded the contract.

The contract was a "fixed-price contract"[2] for a nine month period commencing January 1, 1977. While a fixed-price contract typically places the maximum risk upon the contractor, 48 C.F.R. § 16.202–1 (1985), the German laundry contract was not a typical fixed-price contract. J.E.T.S. did not assume "maximum" risk because the laundry facilities, equipment and utilities were furnished by the Army free of charge. J.E.T.S. inherited an existing work force of approximately seven hundred employees and enough supplies for several months of operations. Additionally, the contract provided for economic price adjustments for increases or decreases in the costs of labor or materials. The contract also provided for two, one year options at a fixed price to be negotiated by the Army and J.E.T.S. The Army did not have to exercise its options, nor did J.E.T.S. have to agree to perform under them.

---

1. Sentner and Causey are not parties to this appeal. Prior to trial, Sentner pled guilty to conflict of interest charge in violation of 18 U.S.C. § 208 (1982 & Supp. III 1986); he testified for the government. After presentation of the government's case, the district court granted Causey's motion for judgment of acquittal. Finding that the evidence against Causey was insufficient, the district court dismissed all of the charges against him.

2. With a "fixed-price contract," the lowest acceptable bidder and the government "agree that the low bidder will perform the contracted work for a stated price. Under such contracts, if the final total costs of the agreed upon services exceed the contracted price, the contractor takes the loss, conversely, he can profit if the costs are lower than the contract price." *United States v. White*, 765 F.2d 1469, 1472 (11th Cir. 1985).

As early as February, 1977, Barnette realized that the German laundry contract was going to be extremely lucrative. On February 10 he informed his banker that the contract was "throwing off" over $100,000 in pre-tax profit per month. Five months later Barnette reported that this figure had doubled.

In July, 1977 the Army notified J.E.T.S. that it intended to exercise its option, extending the contract through September 30, 1978. The Army asked J.E.T.S. to submit a completed Contract Pricing Proposal, a Form DD 633. Barnette signed the form and on September 23, 1977 Barnette and Gibbs certified that the cost and pricing data submitted on the form was "accurate, complete, and current." The government went on to demonstrate that it was not.

When the Defense Contract Audit Agency ("DCAA") decided to perform an audit of J.E.T.S.' proposal, J.E.T.S.' comptroller reported to DCAA that its records of operating supplies were in a state of disarray—accurate records "would not be available during [the] audit period." J.E.T.S.' assistant manager in charge of inventory in the seven plants testified, however, that accurate records were maintained and regularly scheduled inventories were required. Barnette told DCAA auditors in West Germany that J.E.T.S.' records of its general and administrative expenses were in Jacksonville, Florida. Several days later, Barnette and Gibbs told DCAA auditors in Florida that the records were in Germany. DCAA issued a highly qualified report on J.E.T.S.' proposal and the auditors who prepared the report testified at trial that they did not have full access to all relevant information when it was issued.

If the auditors had full access to all relevant information, they would have discovered that J.E.T.S. had fraudulently overstated its expenses misrepresenting how profitable the laundry contract had become. For example, Gibbs submitted exaggerated payroll records to DCAA auditors which included several "managers" who were not employed by J.E.T.S. During the negotiations for the contract exten-

sion, Barnette and Gibbs presented falsified invoices from Hamilton Insurance Company ("Hamilton"), a shell corporation created and owned by Barnette, to support overestimated insurance costs. The evidence showed that at this point, Hamilton had not been paid by JETS Waescherei.

In January, 1978 J.E.T.S. asked the Army to exercise its remaining one year option on the contract. In February, 1978 the Army decided it would extend the contract another year. Sentner, who pled guilty to a conflict of interest charge prior to trial, negotiated the extension on behalf of the government. Barnette submitted a DD 633 form, proposing a four percent increase over 1978's extension price. Barnette had offered Sentner a position with Allied and then informed Sentner that the upcoming DCAA audit would "disrup[t] his operations." Sentner, thereafter, waived the audit requirement and approved Barnette's DD 633 proposal. Sentner testified, "I did not want to unduly antagonize him.... Because of my possibility of future employment with Barnette, I did not aggressively pursue the audits."

If Sentner had not waived the DCAA audit, the auditors would have discovered that J.E.T.S. was experiencing costs well below the estimates provided in the DD 633 form. Its profit rate was increasing dramatically and J.E.T.S.' labor and supply costs had been steadily decreasing. In fact, Barnette falsified J.E.T.S.' accounting records to support the inflated supply cost estimates to ensure consistency in the event J.E.T.S. was audited. Barnette informed the DCAA that Old Dominion Corporation S.A. ("Old Dominion"), a corporation owned by Barnette, sold the supplies to J.E.T.S.. In fact, J.E.T.S. actually purchased and received its laundry supplies directly from the supplier but Old Dominion paid the invoices and billed J.E.T.S. at a substantial markup. Barnette, who prepared the Old Dominion invoices, created fictitious account numbers and altered the invoice number sequence to make it appear that Old Dominion had customers other than J.E.T.S.. J.E.T.S.' General Manager

observed Barnette typing a sham invoice one evening and testified that Barnette asked him whether the figures on the invoice seemed realistic. Finally, the evidence showed that Barnette backdated several supply invoices using invoice forms that had not been ordered from the printer until well after the invoice date.

In the spring of 1979, the Army elected to extend the German laundry contract one more year. This extension, through September 30, 1980, required special Army approval because it was for an additional period beyond the contract term. The Army therefore prepared a comprehensive Government Fair Cost Estimate for Sentner's use in negotiating the third extension. The Army's estimated cost was DM 16,-135,535.

J.E.T.S.' estimated cost, submitted by Gibbs on May 10, 1979, was DM 25,493,-968.[3] In the documentation supporting the DD 633 proposal, Gibbs wrote that "[c]osts to date for fiscal '79 substantiate the accuracy of the estimate." In fact, J.E.T.S.' costs to date were significantly lower than the estimate reported on the DD 633 form and were declining.

Sentner declared the Government Fair Cost Estimate invalid and negotiated a contract price with Barnette and Gibbs. J.E.T.S. submitted a revised DD 633 form reflecting the final negotiations. Fred Johns, Jr., the general manager of JETS Waescherei GmbH, signed the DD 633 form on June 27, 1979 even though the figures listed for projected costs and profits were false. Johns testified that he was reluctant to sign a false statement. Johns expressed his concerns to Gibbs and testified that Gibbs, nonetheless, told him to "go ahead and sign it." In October, 1979 Leo Barnette replaced Johns as general manager of JETS Waescherei GmbH.

In 1980 the German laundry contract came up for rebidding. Apex, then managed by Fred Johns, Jr., the former general manager of JETS Waescherei GmbH, underbid J.E.T.S..[4] On August 15, 1980 the Army determined that Apex was the lowest and best bidder. That evening Gibbs telephoned Sentner at home. Gibbs asked: "What can be done about getting this contract?" Sentner responded: "Nothing; you didn't sharpen your pencil enough." Gibbs told Sentner that there was no longer any possibility of Sentner's future employment with Allied. Barnette later confirmed by letter that Sentner would not be employed with Allied. Sentner recommended that the contract be awarded to Apex.

Since Gibbs had been unable to convince Sentner to help J.E.T.S. get the laundry contract, Allied enlisted the services of Hugh Roberts, III. Roberts, a financial analyst with the Defense Contract Administrative Services Management Area ("DCASMA") performed financial investigations of prospective government contractors. At Barnette's request, Roberts issued a negative pre-award survey of Apex.[5]

---

**3.** The Army required that J.E.T.S. submit a DD 633 proposal to be used for the negotiations. A revised DD 633 Form, accompanied with a certificate of current cost and pricing data, would be prepared after the negotiations to reflect the results of negotiated differences.

**4.** J.E.T.S. knew that Apex would be its principal rival for the 1980 contract award. Gibbs told a J.E.T.S.' employee that Fred Johns, Jr. would be supplying Apex with "detailed information regarding the contract, and of course, would be submitting a very finally [sic] honed bid." Gibbs further remarked that it would be risky for J.E.T.S. to submit a finely honed bid because "it would indicate a very gross profit on their part for the past years."

**5.** Throughout the 1970's, Barnette and Gibbs gave Roberts free meals, loans and cash payments. Roberts testified that his position with DCASMA prohibited him from accepting these gifts, but he accepted anyway. Beginning in 1978, Barnette and Gibbs began exacting a return for their favors, using Roberts as a source of confidential information.

Several weeks after Roberts issued the negative pre-award survey of Apex, JVCC made a $10,000 MESBIC loan to Roberts' daughter Elaine. Roberts had requested the money as a "loan;" Barnette and Gibbs suggested that JVCC loan the money to Roberts' daughter. Roberts falsely certified that Elaine Roberts had a small business concern and then collected a $10,000 cashiers check made payable to Roberts from Gibbs' banker.

Based on this negative survey, Allied obtained a temporary restraining order from the United States District Court for the District of Columbia preventing the contract award to Apex. While DCASMA later reversed Robert's negative survey and Apex was eventually awarded the contract, the Army, in the interim, was forced to award J.E.T.S. a six month extension.

However, the Army insisted that J.E.T.S. provide a detailed DD 633 proposal by September 19, 1980, and agree to a DCAA audit. On September 19, 1980, Leo Barnette submitted a DD 633 proposal. In the proposal, J.E.T.S. claimed that it had a contract with World Management Services to provide J.E.T.S. with five highly skilled managers. The proposal also claimed that J.E.T.S. leased its trucks from a company known as KVV and purchased insurance from Hamilton. World Management Services, KVV and Hamilton were shell corporations created by Barnette and Leo Barnette to exaggerate J.E.T.S.' cost estimates. The evidence showed each of these cost estimates was false.

Based on these misrepresentations and exaggerations, J.E.T.S. once again successfully thwarted DCAA auditors in their attempts to examine J.E.T.S.' accounting records. The government demonstrated that the auditors would have discovered that J.E.T.S. received approximately $45,000,000 over the life of the German laundry contract, of which approximately $18,000,000 was profit, had they been able to examine the records. The government contended at trial and at sentencing that approximately $15,000,000 of this profit was excessive, the result of the appellants' fraudulent scheme.

### C. The Tax Consequences

While Barnette's corporation, Old Dominion, featured prominently in J.E.T.S.' scheme to inflate supply costs, the corporation also played a substantial role in Barnette's plot to willfully "evade [and] de-

feat" his income tax liability. 26 U.S.C. § 7201 (1982).

As discussed previously, the German laundry contract awarded to J.E.T.S. commenced on January 1, 1977. J.E.T.S., part of the Allied conglomerate, had a tax or fiscal year ending May 31. Every June, Allied's independent accountants audited Allied's books and records and prepared financial statements and income tax returns.

In June, 1977, Allied's accountants were prepared to audit the German laundry contract records. Instead of disclosing the laundry contract records, Barnette presented a contract for the sale of JETS Waescherei GmbH by J.E.T.S. to Old Dominion. The contract, dated August 30, 1976, reflected a purchase price of $100,000. Barnette told the accountants that he sold JETS Waescherei GmbH because of the risks associated with the German laundry contract and because Allied was undercapitalized. Barnette did not tell the accountants that he owned Old Dominion. He merely told them that the contract had been executed on December 31, 1976 and that receipts from the German laundry contract should not be listed on Allied's financial statements and income tax returns. One of the accountants testified that he was surprised J.E.T.S. sold "a very large Government contract" for "a small amount of money."

The evidence showed, however, that J.E.T.S. did not sell the contract. The government presented sufficient evidence to establish that the sale of JETS Waescherei GmbH was a sham, carried out solely to evade federal income taxes on the laundry contract profits.[6]

The contract, dated August 30, 1976, was signed by Barnette for J.E.T.S. and Peter Garner for Old Dominion. A J.E.T.S.' employee testified that he first introduced Peter Garner to Barnette in February, 1977.

Other testimony also established that J.E.T.S. did not enter into a contract for the

---

**6.** The "sale" of JETS Waescherei GmbH was documented in Allied's corporate minutes;

Gibbs, therefore, as an officer and director of Allied, knew of and approved the transaction.

sale of JETS Waescherei GmbH in August 1976. Barnette's banker testified that soon after executing the German laundry contract, Barnette became interested in tax planning and looked for methods of sheltering his profits. Through Barnette's attorney, the government introduced documents, including billing records, to show that Barnette did not confer with his attorney until February 16, 1977. In the files subpoenaed from the attorney, there was a draft of the contract for the sale of JETS Waescherei GmbH to Old Dominion. On the draft were the attorney's handwritten notations. The contract Barnette presented to his accountants, dated August 30, 1976, incorporated the attorney's changes. The August 30, 1976 contract could not, therefore, have been executed until after Barnette's attorney made the changes, presumably sometime after February 16, 1977.

In addition, public records from Panama indicated that Old Dominion was not activated until April 18, 1977. The supervisor of a Panamanian printing company testified that the paper used to make the Old Dominion stock certificates dated August, 1976, was not printed until 1977. The paper for the transfer of subscription of Old Dominion stock, dated August 30, 1976, was not printed until 1977.

As far as the Army was concerned, the sale of JETS Waescherei GmbH never took place. The Army never met or negotiated with any representative of Old Dominion. No contract, extension or modification ever mentioned Old Dominion. There was never any correspondence between the Army and Old Dominion. As late as September, 1980, Leo Barnette signed a DD 633 proposal on behalf of J.E.T.S.. In fact, long after the alleged sale of JETS Waescherei GmbH, Barnette, Gibbs, Allied and Leo Barnette continued to represent that J.E.T.S. had the German laundry contract.

According to the government, once it was demonstrated that the sale of JETS Waescherei GmbH was a sham, three consequences followed: First, Allied remained the recipient of the German laundry profits and should have, but did not, report them on its consolidated return.[7] Second, certain payments from JETS Waescherei GmbH to Old Dominion (and to Hamilton) constituted constructive dividends from Allied to Barnette, dividend income which Barnette failed to report or pay to the IRS.[8] Third, Allied, doing business as J.E.T.S., had to include JETS Waescherei GmbH's gross receipts in its gross receipts; if Allied had included these receipts in its gross receipts, Allied and its affiliated companies would have been "large" and thus ineligible to bid on certain set aside contracts administered by the SBA.

### D. The Small Business Set Aside Program

Under the Small Business Act, 15 U.S.C. § 631 (1982 & Supp. III 1986), certain government contracts are set aside for small-business concerns. The Act defines a small-business concern as "one which is independently owned and operated and which is not dominant in its field of operation." *Id.* § 632. The SBA promulgated "size standards" which define when a concern is small. 13 C.F.R. §§ 121.1–121.13 (1986). The size standards for service industries focus on annual receipts; a concern with annual receipts greater than the figure established by the Code of Federal Regulations will not be deemed small. The regulations provide that for size purposes, average annual receipts for the past three years of the company and its affiliates are considered. Other regulations set forth rules for determining size when companies are affiliated. The regulations include a definition of annual receipts. Annual re-

---

**7.** The district court, apparently, disagreed. Before submitting the case to the jury, the district court dismissed the tax charges brought against Allied.

**8.** IRS agents testified that the transactions involving Old Dominion and Hamilton were de-

void of any economic reality. According to the agents, the transactions were structured primarily to benefit Barnette. These transactions should have been reported on his individual income tax return.

ceipts are defined as gross income from any source "as entered on the regular books of account of the concern" and as reportable to the IRS for federal income tax purposes. *Id.* § 121.1(c)(1).

At trial, the government introduced summary charts displaying the ownership interests of Barnette, Allied and Leo Barnette between 1976 and 1981. These charts also showed the interrelationship of these companies. Based on various ledgers and journals introduced into evidence, the government demonstrated that Allied and its affiliates had become "large" for SBA size purposes for most types of contracts. The annual gross receipts charged to Allied included the receipts from the German laundry contract. The evidence showed that these receipts were properly chargeable to Allied whether or not the sale of JETS Waescherei GmbH was a sham because Barnette owned and controlled both J.E.T.S. and Old Dominion.

Notwithstanding the size of the Allied conglomerate, Allied, through Barnette and Gibbs, continued to submit bids on contracts set aside for small business concerns. From 1978 through 1981, Allied falsely certified on each bid document that it was small, and thus eligible to bid on contracts set aside for small businesses.

In February, 1979 J.E.T.S.' size was challenged. Gibbs, on behalf of J.E.T.S., responded to the protest by filing a Small Business Size Determination, Form 355 with the SBA. In answering whether Barnette was an owner, principal, director, employee or principal stockholder in any companies other than Allied, Gibbs made no reference to Barnette's ownership interest in Old Dominion, Hamilton or even JETS Waescherei GmbH. The form contained other omissions [9]

In July, 1979 another protest was filed against Allied. Barnette, on behalf of Allied, submitted a Form 355 in which he did not mention any of the foreign corporations

he owned. He also failed to disclose his interest in World Management Services.

In August, 1980 yet another protest was filed against Allied. Gibbs, on behalf of Allied and J.E.T.S., submitted a Form 355 and attached a cover letter. The evidence showed that Gibbs made several false statements on both the Form and in the letter. In the cover letter, for example, Gibbs stated that "[W]e [J.E.T.S.] presume [JETS Waescherei GmbH] is a company but we have no connection with it." Five days earlier, Gibbs had signed an affidavit, filed with the United States District Court for the District of Columbia, in support of J.E.T.S.' motion for a temporary restraining order preventing the Army from awarding the German laundry contract to Apex, in which he stated that he was a managing director of JETS Waescherei GmbH.

The evidence showed that Gibbs was clearly aware of J.E.T.S.' size problems. In 1980 he told an employee not to refer to the German laundry contract in another bid because if J.E.T.S. listed the laundry contract "in the experience section, it would have to be included in the gross income also [sic]."

Through 1979, Barnette and Gibbs had been successful in concealing Allied's foreign interests from the SBA and its competitors. By that time, however, Allied had grown large enough domestically to disqualify it from bidding on most set aside contracts. Therefore, as a supplemental plan, Barnette, Gibbs and later Leo Barnette, with the assistance of JVCC, began creating front companies to bid on small business set aside contracts.

Established in 1978, JVCC was licensed by the SBA under the MESBIC program. *See* 13 C.F.R. §§ 124.1–1 to 124.3–1 (1986). Under the program, JVCC was permitted to invest and/or lend money to small business concerns which were at least fifty-one percent owned by socially and economically disadvantaged individuals. Barnette and Gibbs ran JVCC.

---

**9.** The jury found that these forms submitted to the SBA constituted mail fraud because the

forms were not reflective of Allied's true size.

The government established that JVCC made several improper loans to front companies controlled by Barnette and Gibbs. Extensive evidence was introduced about Welborn Support Services, Alpha Services, Yate Management Services and Elaine Roberts.

Welborn Support Services, for example, was established in 1979 with a MESBIC loan from JVCC. Its president, Lynda Welborn testified that Barnette owned 80 percent of the company and that Barnette and Gibbs made all of the business decisions. By June, 1979 Lynda Welborn resigned stating "I was totally tired of being ... a puppet on a string and directed in every move that I made." The government demonstrated that other front companies were similarly controlled by Barnette and Gibbs, improperly created to bid on small business set-aside contracts.

## II.

This appeal raises issues concerning 1) the sufficiency of the evidence; 2) jury selection; 3) the admissibility of a summary witness' testimony; 4) the denial of motion for severance; and 5) the restitution order imposed against Barnette. Each of these issues will be discussed in turn.[10]

### A. Sufficiency of the Evidence

■ All of the appellants complain that the evidence presented at trial was insufficient to support their various convictions. In reviewing these claims we must view all the evidence in the light most favorable to the government and make all reasonable inferences in support of the jury verdict. *Glasser v. United States*, 315 U.S. 60, 80,

62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Our review is limited to determining whether "a reasonable trier of fact could find that the evidence establishe[d] guilt beyond a reasonable doubt," *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (footnote omitted) (*en banc*), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[11] Circumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt. The test for evaluating circumstantial evidence is the same as in evaluating direct evidence. *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982) (citation omitted).

We have discussed some of the testimony and exhibits presented during the lengthy and complex trial and a more detailed recitation of the evidence would not be useful. After reviewing the record in the light most favorable to the government we find that a reasonable jury could have concluded beyond a reasonable doubt, based on inferences drawn from the circumstances, testimony and exhibits that appellants were guilty as charged. We hold that the evidence was sufficient to sustain the convictions.[12]

### B. Jury Selection

■ The appellants contend that the jury should have been dismissed because the district court's procedure in selecting the jury violated the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1869 (1982). Specifically, the appellants complain that the court failed to randomly select jurors because "hardship excusals were available for the asking."

---

10. The appellants also attack the RICO count, claiming that the allegations in the indictment and the jury instructions were improper. Appellants also claimed that there was insufficient evidence to prove the required nexus between the enterprise and the racketeering activity. We find these claims meritless and choose not to discuss them.

11. Unit B decisions of the former Fifth Circuit rendered after September 30, 1981 are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

12. Appellant Gibbs, in a separate brief, attacks the sufficiency of the evidence for all of his convictions. A review of the record convinces us that there is no merit to these claims. The evidence presented by the government was substantial and a reasonable jury could have found beyond a reasonable doubt that Gibbs was guilty of the acts for which he was convicted. The evidence was therefore sufficient to support the jury's verdict.

At the direction of the district court, the clerk sent each prospective juror a questionnaire notifying him or her of the projected length of the trial and advising the juror to submit a written request for excusal if service would be a hardship. A form on which the juror could state the reasons for the hardship excusal was provided.

Of the 400 prospective jurors summoned, 360 responded to the questionnaire; 249 requested pre-trial excusals due to hardship; the court granted 245 of these requests. As a result, the appellants argue, the jury "was drawn from the relatively small percentage of individuals, who, due to either a sense of civic duty or lack of better alternatives, were willing to serve."

The Jury Selection and Service Act of 1968 ("the Act") was enacted to ensure that potential jurors are selected at random from a representative cross section of the community and that all qualified citizens have an opportunity to be considered for service. 28 U.S.C. § 1861 (1982). *See* H.R. Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Ad. News 1792. The Act provides that each district court devise a "local plan" for selection of jurors consistent with the objectives of randomness and nondiscrimination set forth in §§ 1861 and 1862. 28 U.S.C. § 1863 (1982). The local plan must be approved by a reviewing panel consisting of the members of the judicial council of the circuit and either the chief judge of the district whose plan is being reviewed or a designate. *Id.* The local plan for the Middle District of Florida was devised and approved pursuant to § 1863 of the Act.

The Act provides relief only when there has been a substantial failure to comply with its provisions. 28 U.S.C. § 1867(a) (1982); *United States v. Bearden,* 659 F.2d 590, 600 (5th Cir. Unit B 1981), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). In *United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984),

*cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985), this court reiterated the applicable standard:

> [T]he alleged violations must be weighed against the underlying principles of the Act. A substantial violation of the Act will be found only when two important general principles are frustrated: (1) random selection of juror names and (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions.

In *Gregory,* we held that no relief was warranted where the defendants pointed to "[m]ere 'technical' deviations from the Act," including the clerk's failure to prepare an alphabetical list of names drawn from the master jury wheel, because mere technical deviations "do not frustrate the obtaining of jury lists that represent a cross section of the relevant community and do not result in impermissible forms of discrimination and arbitrariness." *Id.*

Here, the appellants contend that the district court's procedure violated the fundamental goals of the Act. In "permitt[ing] practically every prospective juror to decide for himself before trial whether or not ... to serve," the district court, according to the appellants, was left with a jury that was not randomly drawn. The appellants rely on *United States v. Kennedy,* 548 F.2d 608 (5th Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).[13]

In *Kennedy,* the district court was faced with a deficiency in the number of qualified jurors for a particular term. To rectify the problem, the jury clerk contacted jurors from the previous term by telephone and asked if they would be willing to perform additional service. The Fifth Circuit roundly condemned the practice, noting "[t]hat the introduction of personal predilections of prospective jurors affects the random nature of the selection process." *Id.* at 612. The court cautioned that a district would substantially depart from the Act's require-

---

**13.** The Eleventh Circuit, in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ments "if it selected all its jurors by randomly drawing names from the qualified jury wheel and allowing those selected to opt in or out at will." *Id.* The court was condemning the prospect of providing jurors with complete discretion on whether or not to serve.

The procedure implemented by the district court in this case, however, did not permit prospective jurors to opt in or out at will. Nor did jurors have discretion to decide whether or not to serve. Each request for a hardship excusal was personally considered by the district court and ruled on based on its individual merits.[14] Contrary to *Kennedy* and the appellants' argument, each prospective juror was simply not permitted "to decide for himself before trial whether or not ... to serve."

Additionally, the appellants' conclusion that the jury was composed only of those individuals with nothing better to do is unfair. There is absolutely no evidence in the record to support such a conclusion. To say, as the appellants do, that the jurors were not as sophisticated or as knowledgeable as a fair cross section of the community because the jurors had nothing better to do than serve on the jury is to speculate "in an area wherein proof is an indispensable prerequisite." *United States v. Anderson*, 509 F.2d 312, 322 (D.C.Cir.1974) (footnote omitted), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975).

With the pre-trial questionnaire, the district court was able to separate those prospective jurors who could from those who could not afford to serve on the jury. Absent any proof from the appellants that the jury was other than a random cross section of the community, we think that the district court's discretion in jury selection is broad enough to encompass consideration of hardship excusal requests. *See United States v. Bryant*, 671 F.2d 450, 455 (11th Cir.1982) (district court has wide discretion in supervising the selection of juries); *Anderson*, 509 F.2d at 322 (discretion broad enough to encompass consideration of ad-

verse consequences suffered in prolonging jury service). We hold that the district court's jury selection procedure did not constitute a substantial violation of the Act.

### C. Admissibility of Summary Witness' Testimony

██ The appellants also complain that the district court erred in permitting IRS Agent John Knee to testify, over the appellants' objections, both as an expert witness and a summary witness. Agent Knee's testimony, the appellants argue, "was beyond the scope of his expertise and wholly improper under the rules governing the use of expert and summary witnesses."

IRS Agent Knee testified for the government as an expert IRS auditor and accountant. Basing his testimony on the evidence and the Internal Revenue Code, Agent Knee gave his opinion of the "income tax implications" as applied to Barnette and Allied. Such expert testimony is clearly permissible. *United States v. Schafer*, 580 F.2d 774, 778 (5th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978).

In giving his opinion, however, the appellants contend that Agent Knee "delivered his personal opinions on a number of critical, contested factual issues which were dispositive not only of the tax counts, but of factual issues central to a number of other counts as well." The appellants therefore conclude that Agent Knee's testimony was prejudicial and improperly invaded the province of the jury. We disagree.

After examining the testimony, we believe Knee properly stated his opinions as an accountant and did not invade the province of the jury. Agent Knee stated that all of his figures were based on either documentary or direct evidence presented during the trial. The record shows that a proper evidentiary foundation had been laid for his testimony. Agent Knee may have been selective in relying on certain evidence while rejecting other evidence, but

---

**14.** The district court carefully reviewed the jury selection procedures it employed in the pre-voir dire excusal of jurors in this case when it considered appellants' motion to dismiss the jury.

that was within his domain as an expert witness. The District Judge instructed the jury as to the weight to be given the expert testimony. Agent Knee's statements were, therefore placed in the proper perspective.[15]

We find that "[t]he correctness or credibility of no materials underlying [Agent Knee's testimony] was even remotely foreclosed ... or withdrawn from proper independent determination by the jury." *United States v. Johnson*, 319 U.S. 503, 519, 63 S.Ct. 1233, 1241, 87 L.Ed. 1546 (1943). The district court's proper guidance left "the jury free to exercise its untrammeled judgment upon the worth and weight of [the] testimony." *Id.* Agent Knee's testimony did not in any way impair the jury's freedom[16] we therefore "ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules." *Id.* at 519–20, 63 S.Ct.

at 1241. We find that the District Judge did not abuse her discretion by admitting Agent Knee's testimony.

## D. The Denial of Motion for Severance

■ Appellant Gibbs filed a separate brief on appeal. He argues that the district court committed reversible error when it refused to grant his motion for a severance under Fed.R.Crim.P. 14.[17] Under Rule 14 the district court must balance the right of defendants to a fair trial against the public's interest in efficient and economic administration of justice. *United States v. Hewes*, 729 F.2d 1302, 1318 (11th Cir.1984), (citing *United States v. Phillips*, 664 F.2d 971, 1016 (5th Cir. Unit B 1981)), *cert. denied, sub nom., Caldwell v. U.S.*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). We will only reverse a district court's denial of severance under Rule 14 for an abuse of discretion. *Id.* (citations omitted).

**15.** After designating Agent Knee as an expert, the District Judge gave the following limiting instruction to the jury:

Ladies and gentlemen, the witness will be permitted to testify as an expert in the field he's being offered in. Again, I've told you several times during the trial, and I'll remind you again that ultimately it will be your decision as to whether or not to accept or reject the witness' testimony in whole or in part, and I'll be giving you further instructions on how you should view someone who is offered as an expert, but I think I've done that throughout the trial, and this witness would be in that same category.

Again, during the direct examination of Agent Knee, the court instructed the jury about the weight to be afforded expert testimony:

Ladies and gentlemen, as I've told you at other times in the trial, if you should conclude the reasons given in support of an opinion are not sound or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely if you wish to.

The Court will permit the witness to give the reasons for his opinions and conclusions. Finally, at the conclusion of the trial, the court gave the following Fifth Circuit Pattern Jury Instruction on expert testimony:

Ladies and gentlemen, the rules of evidence provide that if scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence, or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify and state his

opinion concerning such matters. You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

**16.** At a bench conference during the cross-examination of Agent Knee, the district court extolled the worth of the jury system, finding that the jury in this case understood the function of expert testimony:

Just as a preamble, I certainly have faith in the jury system and in this jury's ability, and they have been very attentive and watched throughout the trial. I don't think they're stupid; I think they're capable of seeing the drift of the evidence, and I don't think they'll be misled into the notion that they must accept the calculations made by the Government expert.

*See also United States v. Johnson*, 319 U.S. 503, 519, 63 S.Ct. 1233, 1241, 87 L.Ed. 1546 (1943).

**17.** Fed.R.Crim.P. 14 provides in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder ... the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

To show that the district court abused its discretion, Gibbs must demonstrate that he suffered "compelling prejudice" as a result of the joint trial. *United States v. Corbin*, 734 F.2d 643, 648 (11th Cir.1984). Appellate courts are reluctant to second-guess a district court's refusal to grant a severance. *United States v. Phillips*, 664 F.2d 971, 1017 (5th Cir. Unit B 1981) (citing cases), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Finally, coconspirators should normally be tried jointly, *United States v. Cole*, 755 F.2d 748, 762 (11th Cir.1985).

 In his effort to demonstrate "compelling prejudice," Gibbs relies primarily on the jury's verdict. Gibbs contends that because Barnette and Allied were found guilty of the same counts as Gibbs, the jury did not separately consider the guilt of each defendant. Gibbs stated that he "'sank or swam' with Barnette and Allied." According to Gibbs, the jury's confusion was "understandable" as it was an extremely complex case.

We have, however, upheld joint trials in cases involving greater complexity than this. *See e.g., United States v. Morrow*, 537 F.2d 120, 136 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). "[T]he mere fact that the conspiracy involved multitudinous and complex transactions is no reason for this court to reverse the denial of the motion to sever...." *United States v. Payne*, 750 F.2d 844, 859 (11th Cir.1985) (quoting *United States v. Wayman*, 510 F.2d 1020, 1024 (5th Cir.), *cert. denied*, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975)). Gibbs has not suffered compelling prejudice merely because Barnette and Allied were similarly found guilty in this complex case.

Barnette and Gibbs, president and vice president respectively of Allied, were shown to have participated in the various counts of the indictment in which each was named. The evidence against each was substantial. We find that Gibbs has not shown compelling prejudice. Any prejudice in the joint trial was cured by the district court's cautionary instructions.

"The remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction." *United States v. Morrow*, 537 F.2d 120, 136 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). We hold that the district court did not abuse its discretion in refusing to grant a severance.

E. Restitution Order Imposed Against Barnette

Appellant Barnette attacks portions of his sentence that require that he pay seven million dollars restitution to the United States. The district court imposed restitution on five different counts to run concurrently. On Count 1 (conspiracy) and on Count 15 (bribery of Sentner), Barnette was sentenced to concurrent prison terms of five years and ordered to pay restitution. On Count 7 (false statements), Count 8 (false statements) and Count 25 (RICO), Barnette was placed on probation for five years on condition that he pay restitution to the government in the amount of seven million dollars.

 Barnette contends that the district court's order of restitution on Counts 1 and 15 is void because the court lacked the authority to order restitution on those counts. According to Barnette, the only source of the district court's power to order restitution in this case is 18 U.S.C. § 3651 (1982 & Supp. III 1986). Section 3651 provides that the court "may suspend the imposition or execution of sentence and place the defendant on probation." While on probation, the defendant "[m]ay be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." Because the order of restitution on Count 1 and 15 was not coupled with a probationary sentence, Barnette concludes that the restitution order is invalid.

The Victim and Witness Protection Act, 18 U.S.C. §§ 3579–3580 (1982 & Supp. III 1986), however, provides in pertinent part

that a district "court, when sentencing a defendant convicted of an offense under this title ... may order, *in addition to or in lieu of any other penalty authorized by law,* that the defendant make restitution to any victim of the offense." 18 U.S.C. § 3579(a)(1) (1982) (emphasis added). Effective with respect to offenses occurring after January 1, 1983, the Victim and Witness Protection Act empowers a court, "for the first time, to order payment of restitution independently of a sentence of probation." S.Rep. No. 97–532, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S. Code Cong. & Ad. News, 2515, 2536.

While section 3579 cannot save the restitution order imposed as part of the sentence on Count 15, the restitution ordered on Count 1 is authorized. The bribery charged in Count 15, according to the indictment, occurred "from October 31, 1979 to February 22, 1980," well before the effective date of the Victim and Witness Protection Act. The conspiracy in Count 1, however, is alleged to have begun in July, 1976 and to have continued to the filing of the indictment. The indictment was filed on August 30, 1983, several months after the Act's January 1, 1983 effective date.

Barnette argues against the apparent applicability of the Victim and Witness Protection Act, stressing that the conspiracy's last overt act allegedly occurred in March, 1982. There is no requirement, however, that an indictment enumerate every overt act performed in furtherance of a conspiracy.

The duration and termination of a conspiracy is determined by the particular facts of each case. *United States v. Varella,* 692 F.2d 1352, 1362 (11th Cir.1982) (citations omitted), *cert. denied,* 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983). The evidence showed that many acts were performed and statements made in furtherance of the conspiracy after January 1, 1983 which demonstrated the conspiracy's continuing nature. For example, in February, 1983, Allied submitted its corporate tax return for its fiscal year ending May 31, 1982, which served to perpetrate the

fraud on the IRS. Barnette filed his individual income tax return for 1982 in October, 1983. In March, 1983 Leo Barnette made a false statement concerning Allied's foreign bank accounts and in October, 1983, gave the Federal Bureau of Investigation disguised exemplars of his handwriting. In addition, many of Barnette's shell corporations were still in existence or operating at the time of the indictment. The evidence demonstrated that the conspirators continued to defend and promote their fraudulent scheme after January 1, 1983, *see id.* Therefore, the restitution order imposed as part of the sentence on Count 1 is authorized.

Barnette also argues that the restitution ordered on Counts 1, 7, 8 and 25 is invalid because the amount of "restitution ordered in no way represents actual damages [suffered by the government as a result of] the specific crimes charged in those counts." We disagree.

█ The amount of restitution under 18 U.S.C. § 3579(b)(1) (1982) or 18 U.S.C. § 3651 (1982 & Supp. III 1986) may not exceed the actual losses flowing from the offense for which the defendant has been convicted. *See United States v. Johnson,* 700 F.2d 699, 701 (11th Cir.1983) (per curiam). A sentencing court may not "impose fees and charges at will on a defendant," *Fiore v. United States,* 696 F.2d 205, 209 (2d Cir.1982); the amount of actual losses must be established in some manner. *Cf. Johnson,* 700 F.2d at 701–702 (remand for resentencing where reviewing court could not ascertain what district court relied on in arriving at restitutionary figure). The amount may be established by proof at trial, *see United States v. Stoehr,* 196 F.2d 276, 284 (3d Cir.), *cert. denied,* 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952); by some other judicial determination, *United States v. Boswell,* 565 F.2d 1338, 1342–43 (5th Cir.), *cert. denied,* 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978); or by admission, *United States v. Grugette,* 678 F.2d 600, 604 (5th Cir.1982).

█ In this case, the evidence introduced at trial established that the conspiracy net-

ted approximately fifteen million dollars in excess profits from the German laundry contract alone. Even Barnette conceded that he realized nearly seven million dollars in excess profits from 1979 to 1981. The proof at trial clearly established a basis for the restitution order. The restitution order imposed as part of the sentence on Count 15 is vacated. The restitution orders imposed on all other counts are affirmed.

### III. CONCLUSION

Based on our consideration of all arguments made by appellants we conclude that the judgment of the district court is AFFIRMED.

