[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11150
Non-Argument Calendar
_____

D.C. Docket No. 0:17-cr-60093-BB-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TIMOTHY JOHN BEVERLEY,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 17, 2019)

Before WILLIAM PRYOR, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

"He's very well-known in aviation, somewhat of a legend." Tim Beverley's

former business partner, Matt Franzak, testified thus about Beverley's skills as an

airplane salesman. "He's the best there is. . . . He was a mentor and I idolized him." After Beverley was released from prison following a white-collar conviction, Franzak entrusted Beverley with his aviation business until he discovered—and a jury later found—that Beverley had been secretly redirecting the company's funds to finance his own lavish lifestyle.

Beverley appeals his convictions and sentence for four counts of wire fraud, 18 U.S.C. § 1343;[1] four counts of filing a false tax return, 26 U.S.C. § 7206(1);[2] and five counts of making a false statement to the United States, 18 U.S.C. § 1001.[3] Beverley challenges two evidentiary rulings of the district court, the sufficiency of the evidence, and the calculation of his sentence under the Sentencing Guidelines. Because we find no merit to these arguments, we affirm Beverley's convictions and sentence.

---

[1] "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343.

[2] "Any person who . . . [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution." 26 U.S.C. § 7206.

[3] "[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title, imprisoned not more than 5 years . . . or both." 18 U.S.C. § 1001(a).

2

# I.    BACKGROUND

In 2004, Beverley pleaded guilty to money laundering, 18 U.S.C. § 1957,[4] and was sentenced to 72 months' imprisonment, 3 years' supervised release, and $18.1 million restitution. The original 14-count indictment charged that, since 1999, Beverley had been skimming funds from the brokering and financing of aircraft sales in Texas for his personal use and benefit. Following his release from prison, Beverley moved to Florida and began work as an airplane salesman for charter operator Majestic Jet. As a condition of his supervised release, the U.S. Probation Office required him to submit monthly financial statements so that his income-based restitution payment obligations could be calculated. *See* 18 U.S.C. § 3664(k) ("A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution.").

In 2017, Beverley was indicted on 15 counts including wire fraud, filing a false tax return, and making a false statement to the United States. The charges alleged that Beverley defrauded Majestic Jet and its sales arm, Majestic Jet International, by diverting commission payments from airplane sales to third-party accounts. Beverley allegedly used those funds, in transactions disguised as

---

[4] "Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be . . . fine[d] under title 18, United States Code, or imprison[ed] for not more than ten years or both." 18 U.S.C. § 1957(a).

business expenses like airplane repair and maintenance, for personal expenses including a yacht and the rental of waterfront homes. The indictment further alleged that Beverley failed to report those payments as income on his tax returns for 2010 through 2013.[5] Finally, the indictment alleged that Beverley failed to report those payments as income on his monthly financial statements to the U.S. Probation Office in 2012.

The case went to trial. Over the course of nine days, the government presented extensive testimony about Beverley's financial dealings with Majestic Jet and Majestic Jet International. Franzak testified that, in light of Beverley's restitution obligations, he agreed to pay Beverley only a salary of $60,000 per year. Beverley would not keep any commissions he might earn from the sales of aircraft; instead, those funds would go back into Majestic Jet International and be set aside to finance the purchase and sale of more airplanes. As the company grew, Franzak eventually realized that Beverley had used Majestic Jet and Majestic Jet International funds to pay for personal expenses, such as a yacht and a Cadillac for his girlfriend. An accountant for Majestic Jet confronted Beverley, who eventually made some repayments. An escrow agent testified about Beverley's use of escrow

---

[5] Relevant to the false tax return charges, Beverley had accrued around $8 million in net operating loss from the involuntary bankruptcy of aviation companies he operated in Texas in the 1990s. Beverley filed personal bankruptcy in 2002. In 2008, that $8 million debt was discharged in the bankruptcy proceedings. Beverley nonetheless continued to report the $8 million net operating loss as negative income on the tax returns at issue here, reducing his tax liability to zero.

accounts to direct funds from airplane sales to other accounts and entities, such as the company that owned Beverley's yacht. A friend of Beverley's testified that she allowed Beverley to transfer funds into the accounts of her aircraft-related companies, which she then directed to cover Beverley's personal expenses, such as his yacht, his rent, and a hyperbaric chamber. Beverley's girlfriend also testified that her aviation company received escrow funds for Beverley and used them to purchase Beverley a golf cart and the yacht.

Pilot Jimmy Jacobs testified that Beverley came to him with the idea of starting an airplane brokerage together. That company, MJJJ, bought and sold four airplanes. Jacobs put in some of the money, but Beverley did all of the sales work. Jacobs explained, "I think that we have to assume that everything that's happened—everything that happens in MJJJ is basically Tim [Beverley] orchestrating it. . . . [A]nything that came into the MJJJ bank account was Tim's."

Beverley sought to exclude the lay opinion testimony of IRS Special Agent Moises Assael about whether certain financial transactions constituted income to Beverley. The district court denied the motion. Assael served as a summary witness and testified about his investigation into Beverley's income. He had looked at 19 different aircraft sales and created flowcharts that showed how some of the funds were used for Beverley's benefit. He also presented summary charts he had made for each bank account at issue. He also reviewed Beverley's tax returns and

5

discussed his net operating loss carryovers and his calculations of unreported income.

The government also presented evidence about Beverley's 2010, 2011, and 2012 federal tax returns. Beverley's tax preparer testified that the 2010 return reported only $59,583 of wage income and $8,021,043 of negative income, a net operating loss that was being carried forward from Beverley's aviation businesses in Texas. The 2011 return reported $81,667 of wage income and –$7,967,160 of net operating loss carryover. The 2012 return reported $85,000 of wage income and –$7,890,163 of net operating loss carryover. None of those returns reported any additional income from airplane sales. The tax preparer noted on the tax returns and in his testimony that there was some uncertainty about the continued availability of the net operating loss because Beverley repeatedly told him that his bankruptcy discharge status remained unclear.

Beverley's probation officers also testified that his monthly income statements reported only his salary from Majestic Jets. Before trial, Beverley had moved to exclude any mention of the fact that his allegedly false statements were to the probation office, arguing that this evidence was unfairly prejudicial because it would alert the jury that he had a prior record. The district court denied the motion, reasoning that Beverley's probation reporting requirements were

6

inextricably intertwined with the other allegations and had substantial probative value.

At the close of the government's evidence, Beverley moved for a judgment of acquittal. *See* Fed. R. Crim. P. 29. The court dismissed two of the false statement charges when the government conceded it had not proven false statements for two of the monthly reports, but it denied the motion with respect to the remaining charges. Beverley presented no evidence on his own behalf. The jury reached a verdict of guilty on all of the remaining counts after 23 minutes of deliberations, before the physical exhibits were even delivered to the jury room. Beverley moved for acquittal notwithstanding the verdict or for a new trial, *see* Fed. R. Crim. P. 29(c), 33, which the court denied.

The presentence investigation report set the total offense level at 27, which included a 16-level enhancement for a loss amount between $1.5 million and $3.5 million, and a 2-level enhancement for offense conduct involving sophisticated means. With a criminal history category of III, the advisory Guidelines sentencing range was 87 to 108 months' imprisonment. U.S.S.G. § 5A (2016). Beverley filed objections.

The district court overruled Beverley's objection to the sophisticated means enhancement for the wire fraud counts, but sustained his objection to the sophisticated means enhancement for the tax fraud counts. The court heard

testimony from Special Agent Assael regarding Beverley's objection to the loss amount, which Beverley argued overstated the loss by $476,000. The court overruled the objection and concluded that the appropriate loss amount was $1,572,980. Beverley argued for a sentence of 60 months' imprisonment, but the district court imposed a total sentence of 90 months' imprisonment. It also imposed 3 years' supervised release and ordered $634,906 in restitution to the IRS. Beverley now appeals.

## II.    DISCUSSION

On appeal, Beverley raises three main groups of challenges to his convictions and sentence. First, he argues that the district court abused its discretion when it allowed into evidence the fact that he was on supervised release, owed restitution, and was required to report to the U.S. Probation Office, and when it permitted the lay opinion testimony of IRS Special Agent Assael about whether certain transactions constituted income to him. Second, Beverley argues that the evidence of his intent was legally insufficient to permit the jury to convict him of filing false tax returns and making false statements. Third, he argues that the district court committed clear error in its Sentencing Guidelines findings with respect to the amount of loss and the use of sophisticated means. We discuss each group of arguments in turn.

8

### A.    Evidentiary Rulings

We review the district court's evidentiary rulings only for a clear abuse of discretion. *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (Rule 403); *United States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017) (Rule 701). Beverley first argues that allowing the jury to hear that he was obliged to report to the probation office and pay restitution—as opposed to simply hearing a stipulation that he was required to report to the government—was unfairly prejudicial. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). He maintains that this admission must have affected his substantial rights because the jury deliberated for only 23 minutes before convicting him on all counts.

The district court did not abuse its discretion when it found that any unfairly prejudicial danger from disclosing Beverley's obligation to report to the probation office did not substantially outweigh its probative value. As a general matter, Rule 403 strongly presumes evidence to be admissible. *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). "Rule 403 is an extraordinary remedy that must be used sparingly because it results in the exclusion of concededly probative evidence." *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1211 (11th Cir. 2009). "[T]he application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force,

9

dragged in by the heels for the sake of its prejudicial effect." *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979). Viewing the evidence in a light most favorable to its admission, *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006), Beverley's obligation to report to the probation office was not a peripheral fact "dragged in by the heels" in order to prejudice the jury against him. Rather, it was a fact central to proving the mental state that underlay all of Beverley's frauds. Understanding the probation office's responsibility for calculating the share of Beverley's income that must be paid toward his restitution obligation was essential to appreciating Beverley's motive to finance a lavish lifestyle off the books, and thus avoid meeting his restitution obligations.

The case on which Beverley here relies actually supports our reasoning. *See Old Chief v. United States*, 519 U.S. 172, 174 (1997) (holding that, during a trial for illegal possession of a firearm by a felon, 18 U.S.C. § 922(g), the defendant must be allowed to stipulate to the fact of his prior conviction). Beyond its narrow holding, which we have never extended beyond the context of § 922(g) trials, *Old Chief* quotes favorably the explanation of the former Fifth Circuit that the government is ordinarily entitled "to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight." *Id.* at 187 (quoting *Parr v. United States*, 255 F.2d 86, 88 (5th Cir. 1958)). We find that the

10

full context of Beverley's reporting obligation here likewise "tells a colorful story with descriptive richness." *See id.* Allowing the jury to understand that Beverley owed restitution in proportion to the income he reported to the probation office illuminated his powerful incentive to amass unreported funds in a way that a reporting requirement stipulation would not. The government was entitled to present the evidence that told that story. And the district court appropriately mitigated any unfair prejudice from that evidence when it instructed the jury that it could consider only evidence of his prior acts for the very limited purpose of determining his *mens rea* after finding that he committed the charged acts.

Beverley also argues that the district court abused its discretion when it allowed Special Agent Assael to give an expert legal opinion about the meaning of income. We disagree. The district court did not abuse its discretion when it allowed Assael to offer his lay opinion about whether he considered certain funds he traced to be Beverley's income or not. Although Assael's opinion goes to an ultimate issue in the case, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Rule 701 allows lay opinion testimony that is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Assael's testimony was rationally based on his perception of the

11

financial and tax records he reviewed and of the interviews he conducted with the account owners. It was helpful to allowing the jury to understand the voluminous financial records they had seen and the extensive witness testimony they had heard. And, contrary to Beverley's contention, it was not based on specialized tax or legal knowledge. Most important, Special Agent Assael's opinions "did not in any way impair the jury's freedom" to examine the financial evidence, to assess the credibility of the witnesses, and to determine which, if any, transactions resulted in income that Beverley did not report to the IRS.[6] *See United States v. Barnette*, 800 F.2d 1558, 1569 (11th Cir. 1986). Assael explained each of his income designations based upon evidence that the jury had heard and was entitled to accept or reject, and Beverley's counsel thoroughly explored these designations during his cross-examination of Assael. The district court did not abuse its discretion in allowing Special Agent Assael to opine about Beverley's income.

## B.    Sufficiency of the Evidence

We review a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal de novo, viewing the evidence and drawing all reasonable inferences and credibility determinations in the light most favorable to the guilty verdict. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th

---

[6] We note that Beverley did not object to and does not now appeal the district court's instruction to the jury on the meaning of income and its responsibility for determining whether funds were income to Beverley. And we presume that the jury followed those instructions. *See Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983).

Cir. 2015). We will uphold the verdict if a reasonable jury could conclude that the evidence establishes guilt beyond a reasonable doubt, and we will not overturn a jury's verdict if there is any reasonable construction of the evidence that would allow a jury to find the defendant guilty beyond a reasonable doubt. *Id*.

Beverley argues that the evidence was insufficient to prove that he knew he had a duty to report the funds in question as income (1) on his tax returns and (2) to the probation office. As to both, we disagree. The willfulness element of 26 U.S.C. § 7206(1) requires proving that the defendant knew of and voluntarily and intentionally violated his legal duty. *United States v. Morris*, 20 F.3d 1111, 1115 (11th Cir. 1994) (citing *Cheek v. United States*, 498 U.S. 192, 201 (1991)).[7] That willfulness may be inferred from circumstantial evidence. *United States v. Hesser*, 800 F.3d 1310, 1323 (11th Cir. 2015) ("That a defendant acted willfully may be inferred from his conduct."). Likewise, the requisite willfulness for violations of 18 U.S.C. § 1001 may be proven by inference from circumstantial evidence. *United States v. Gafyczk*, 847 F.2d 685, 692 (11th Cir. 1988).

Viewed in the light most favorable to the verdict, the evidence here allowed a reasonable jury to infer that Beverley willfully and intentionally misrepresented his income on his tax returns and his reports to the probation office. His pattern of

---

[7] *Cheek* involved a tax protester's convictions under 26 U.S.C. §§ 7201 and 7203. *See Cheek*, 498 U.S. at 193–94. Our Circuit has applied *Cheek*'s holdings about the willfulness element of tax crimes to convictions under § 7206(1). *See Morris*, 20 F.3d at 1115; *United States v. Lankford*, 955 F.2d 1545, 1550 & n.13 (11th Cir. 1992).

surreptitious conduct—of routing income through third parties and bank accounts, of labeling payments to look like legitimate aviation business expenses, and of consistently underreporting his income—was strong evidence of an intent to conceal income. That intent could allow a reasonable jury to conclude that Beverley was willfully and intentionally evading a legal duty to report that income. *See Hesser*, 800 F.3d at 1323–24; *United States v. Daniels*, 617 F.2d 146, 148–49 (5th Cir. 1980). Thus, we will not overturn the jury's verdict.

Beverley also argues that, with respect to his tax returns, the government failed to prove that he knew he was not entitled to report as negative income the $8 million net operating loss. But that argument is a red herring. Beverley's failure to report as positive income the funds he diverted from his employer supplied, on its own, sufficient evidence to sustain the tax fraud convictions.

## C.    Guidelines Calculations

We review the factual findings underlying the district court's Guidelines calculations for clear error. *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999) (fraud loss amounts); *United States v. Sosa*, 777 F.3d 1279, 1300 (11th Cir. 2015) (sophisticated means). Beverley first argues that the district court's wire fraud loss calculation of $1.5 million, which resulted in a 16-level enhancement, was erroneous. *See* U.S.S.G. § 2B1.1(b)(1)(I). Beverley asserts that the loss should

14

have been at most $1 million because $476,000 of the diverted funds went not to his own benefit but rather were reinvested in airplane sales via the company MJJJ.[8]

The government responds that the evidence showed that Beverley inflicted $1.5 million of actual loss upon Majestic Jets when he diverted those funds and never returned them. *See* U.S.S.G. § 2B1.1, cmt. n.3(A). We agree. Although there was some testimony that MJJJ was a joint venture with Majestic Jets, MJJJ's co-owner Jacobs testified that "anything that came into the MJJJ bank account was Tim[ Beverley]'s." That evidence allowed the district court to conclude that funds that were transferred to MJJJ from Majestic Jets or Majestic Jets International were fraud losses to those companies. The district court thus did not clearly err when it calculated that wire fraud loss.

Beverley also asserts in passing that the tax fraud loss should have been zero in light of the $8 million net operating loss to which he was entitled. He would have us compute the tax loss at zero because, even if he had reported the additional $1 million or so of income, his tax liability would have been the same—zero—in light of that carryover loss. But in light of the entire record, we disagree. Because the record does not definitively show whether Beverley was entitled to deduct the $8 million loss from his income on the returns in question, the district

---

[8] Although Beverley does not so mention in his initial brief, the government conceded at sentencing that $20,000 of that sum should not have been considered income to Beverley, and the district court deducted it from the loss amount.

15

court was entitled to make a "reasonable estimate" of the tax loss. U.S.S.G. § 2T1.1 cmt. n.1. The Guidelines broadly define tax loss as "the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." *Id.* § 2T1.1(c)(1). In the absence of a more accurate assessment, the Guidelines provide a presumption that the tax loss from underreported income "shall be treated as equal to 28% of the unreported gross income." *Id.* § 2T1.1(c)(1) n.A. The district court did not err in applying that presumption to Beverley's unreported gross income of $1.5 million. *See, e.g.*, *United States v. Zitron*, 810 F.3d 1253, 1257, 1261 (11th Cir. 2016) (upholding tax losses under U.S.S.G. § 2T1.1(c)(1) from total fraud loss amount when defendant had reported negative gross income). Thus, having concluded that the wire fraud loss was not clearly erroneous insofar as it included the funds that went to MJJJ, and noting that the record contained evidence that MJJJ funds belonged to Beverley, we also find that the tax fraud loss, calculated as 28% of that amount, was not clearly erroneous.

Finally, Beverley argues that the 2-level enhancement the district court applied for using sophisticated means in the commission of the wire fraud counts was also clearly erroneous. We disagree. The enhancement for sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C), is appropriate when there was "especially complex or especially intricate offense conduct pertaining to the execution or

16

concealment of an offense," *id.* cmt. n.9(B). In assessing whether sophisticated means were used, a court is to consider "the totality of the scheme." *Sosa*, 777 F.3d at 1302 (quoting *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010)). Doing so, we agree with the district court that Beverley's extended pattern of making financial transfers out of escrow accounts in order to conceal the offense from his employer was the kind of "especially intricate" conduct contemplated in U.S.S.G. § 2B1.1(b)(10)(C). Beverley's direction of these personal transactions through aviation-related companies in order to disguise them as legitimate business expenses particularly demonstrates an intent to conceal and to prolong the execution of the offense. The enhancement for using sophisticated means was not clearly erroneous.

## III.   CONCLUSION

For the foregoing reasons, Beverley's convictions and sentence are

**AFFIRMED.**