UNITED STATES of America,
Plaintiff–Appellant,

v.

Larry D. BARNETTE, Defendant–
Appellee.

No. 91–3206.

United States Court of Appeals,
Eleventh Circuit.

Jan. 7, 1994.

Douglas Letter, Appellate Staff, Civ. Div., Dept. of Justice, Washington, DC, for plaintiff-appellant.

Christine A. Clark, Charles W. Arnold, Jr., Jacksonville, FL, for defendant-appellee.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and CLARK, Senior Circuit Judge.

CARNES, Circuit Judge:

In this civil action the Government seeks damages from Appellee Larry D. Barnette, who has previously been convicted and sentenced for defrauding the Government. The district court granted summary judgment for Barnette based on its holding that the Government is barred from recovering damages in excess of the amount of restitution Barnette was ordered to pay in the criminal proceeding. We now reverse the district court's decision and remand for further proceedings, including a determination of the total loss that Barnette's crimes caused the Government, so that the doctrine of *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), may be applied properly.

## I. BACKGROUND

Between 1977 and 1981, Barnette and his associates defrauded the United States of millions of dollars through a complex conspiracy involving, among other things, a government contract for laundry services for the United States Army in Germany. The details of Barnette's many crimes are recounted in *United States v. Barnette*, 800 F.2d 1558, 1560–66 (11th Cir.1986) (*"Barnette I "*), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987). In 1984, a jury convicted Barnette on 17 counts, including racketeering, mail fraud, bribery, false statements, income tax evasion, and misapplication of government funds. The jury convicted several co-conspirators as well. *Id.* at 1560.

At sentencing, the United States sought an order requiring Barnette to pay restitution of $15 million, the Government's estimate of Barnette's excess profit. Barnette disputed the Government's estimate, contending that his illegal profit was at most $6.8 million. Without resolving the parties' dispute, the district court ordered Barnette to pay $7 million in restitution. The district court also sentenced Barnette to five years in prison and another five years on probation.

On direct appeal, we affirmed Barnette's convictions and, with one minor exception, the sentencing judge's restitution order. *Barnette I*, 800 F.2d at 1572. In doing so, we stated that "the evidence introduced at trial established that the conspiracy netted approximately fifteen million dollars in excess profits from the German laundry contract alone." *Id.* at 1571–72.

After Barnette's criminal conviction, the Government filed this civil action against Barnette and his co-conspirators, asserting claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1964 (1984 & Supp.1993), the False Claims Act, 31 U.S.C.A. § 3729 (1983 & Supp.1993), and various common law theories. The Government's present claims arise from the same conduct for which Barnette was convicted. The Government alleges that Barnette's illegal actions caused the United States to suffer at least $15,750,153 in direct loss. At oral argument, the Government also asserted that it has incurred substantial investigation and prosecution costs as a result of Barnette's fraud. The Government now seeks between $18.1 million and $50.5 million from Barnette, depending upon the theory of recovery. (The Government's theories of recovery and prayers for relief are set out in the Appendix to this opinion.) At oral argument, the Government conceded that Barnette may offset the $7 million in restitution that he already paid as part of his criminal sentence against any new civil judgment.

The district court granted Barnette's motion for summary judgment against the Government. The court, through a judge different from the one who had sentenced Barnette, decided that the sentencing judge's restitution order constituted a finding of fact that the Government had lost only $7 million. The court reasoned that this sentencing finding estopped the Government from relitigating the amount of its damages. Citing *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the district court concluded that, because Barnette had already been tried and sentenced, awarding

the Government treble damages in this case would subject him to a second punishment in violation of the Double Jeopardy Clause.

Although numerous counts remain against other defendants, the district court certified its summary judgment order for immediate interlocutory review pursuant to 28 U.S.C.A. § 1292(b) (1993), and we permitted the appeal. Because we conclude that the sentencing judge never determined the extent of the Government's loss, we now reverse the order granting summary judgment and remand for findings on the amount of the Government's loss and for reconsideration of Barnette's summary judgment motion in light of those findings and this opinion.

## II. DISCUSSION

The Government contends on appeal that the district court erred in holding that the Double Jeopardy Clause [1] and the doctrine of collateral estoppel bar recovery under this civil suit. We exercise plenary review over the district court's legal conclusions and review that court's findings of fact for clear error. *E.g., Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1244 (11th Cir. 1991); *Balbirer v. Austin*, 790 F.2d 1524, 1526 (11th Cir.1986).

### A. DOUBLE JEOPARDY

The district court held that recovery in this civil suit would violate Barnette's double jeopardy rights. The court reasoned that, because the Government has already received full compensation from Barnette's restitution sentence, the present case was "nothing more than a further attempt to 'prosecute' the defendant civilly." We now consider whether the Government's effort to obtain further compensation in this case is such an attempt.

#### 1. Sentencing Judge's Restitution Order

The district court concluded that the sentencing judge's $7 million restitution order constituted a "prior judicial determination" of the amount of the Government's loss. This

conclusion underpins the remainder of the district court's summary judgment order, so we address it as a threshold issue.

The parties dispute whether we should treat the district court's interpretation of the sentencing judge's order as a finding of fact or a mixed finding of law and fact. We need not resolve this dispute. After reviewing this case, "we are left with a definite and firm conviction that a mistake has been committed." *United States v. Roy*, 869 F.2d 1427, 1429 (11th Cir.), *cert. denied*, 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989). Because the district court's conclusions are clearly erroneous, we must reverse even if the more deferential standard of review is applicable.

The sentencing judge carefully avoided making factual findings as to the total amount of the Government's loss. As initially drafted, Barnette's presentence report stated that the defendants' criminal activities earned them " 'approximately $15,000,000 in excess profits to which they were not entitled.' " Barnette objected to the original report's assessment of the evidence and asked the judge to leave the amount of the Government's loss undecided "[r]ather than conduct[ing] an extensive hearing on this point." The judge agreed. During the sentencing hearing, she ordered the probation department to revise the presentence report to set forth both the Government's and Barnette's position on this issue, and to state specifically that neither she nor the probation department would resolve the dispute. As revised according to the sentencing judge's express instructions, the final presentence report reads, in pertinent part:

> The Government maintains that the evidence shows that defendants made false and fraudulent statements relating to costs that allowed $15,000,000 in excess profits. Defendants maintain that the evidence shows that the German laundry contract was a fixed price contract and that defendants were not limited to a specific profit amount of 10%. The defendants maintain that a profit of $6,851,134.00 over and

---

**1.** "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. Const. Amend. V.

above the 10% profit figure was made in fiscal years 1979, 1980 and 1981. *The Court and Probation Office make no specific finding as to an amount of 'excess profits'* that may or may not have been made under the German laundry contract. [emphasis added]

In the face of these events, Barnette argues that the sentencing judge determined the magnitude of the Government's loss later in the sentencing hearing. According to Barnette, when the sentencing judge decided "that the proper amount of restitution was $7 million, she implicitly rejected the government's calculation of loss." Barnette argues that his view of the judge's restitution order can be inferred from that order and is also supported by a statutory presumption.

■ We first reject Barnette's inference argument. Although Barnette offers one possible explanation of the sentencing judge's ruling, it is neither the only nor the most persuasive interpretation. An order of restitution is not a judicial determination of damages. Damages measure the amount of compensable loss a victim has suffered. Restitution, by contrast, is an equitable remedy, "subject to the general equitable principle that [it] is granted to the extent and only to the extent that justice between the parties requires ... ." Restatement of Restitution ch. 8, topic 2, introductory note, at 596 (1936); *accord Williams v. Washington Metro. Area Transit Comm'n,* 415 F.2d 922, 944 (D.C.Cir.1968) ("[R]estitution is not a matter of right, but is 'ex gratia, resting in the exercise of a sound discretion' ... .") (quoting *Atlantic Coast Line R.R. v. Florida,* 295 U.S. 301, 310, 55 S.Ct. 713, 717, 79 L.Ed. 1451 (1935)), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); *cf. Frederick County Fruit Growers Assoc. v. Martin,* 968 F.2d 1265, 1274 (D.C.Cir.1992) (holding that "less than full restitution is appropriate in certain circumstances"); *Thompson v. Washington,* 551 F.2d 1316, 1319 (D.C.Cir. 1977) ("[T]he general principles governing the shaping and review of equitable decrees are fully applicable to awards of restitution."). For example, the Victim and Witness Protection Act of 1982, Pub.L. No. 97–291, 96 Stat. 1253, 1255 (now codified at 18 U.S.C.A. §§ 3663–3664 (1985 & Supp.1993)) ("VWPA"), specifically directs a sentencing judge to consider not only the victim's injury, *but also* "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C.A. § 3664(a) (1985 & Supp.1993).

■ Barnette's attempt to equate the sentencing judge's restitution order with a determination of damages is therefore unpersuasive. More likely, the sentencing judge decided that the Government had lost *at least* $7 million and that Barnette could pay that amount, but left final resolution of the Government's damages claim to the ensuing civil case. This interpretation of the judge's decision comports with her disavowal that same morning of a determination of the Government's total loss. Barnette's approach, by contrast, would require us to read the sentencing judge's *silence* at one moment as an intention to do implicitly that which she had *expressly* disavowed any intention of doing just a few minutes earlier.

If the parties and the sentencing court had been under the impression that the Government's only chance of recovering its losses from Barnette was through the restitution order, there might be some reason to infer that the court had set restitution at the total amount of the loss. The facts, however, are just the opposite. The transcript of the sentencing hearing indicates that the sentencing judge knew that the Government had brought civil claims against Barnette. In fact, in his sentencing memorandum, Barnette argued against restitution on the ground that the Government was seeking to recover damages in civil actions.

Our reading of the sentencing court's actions is also more compatible than Barnette's with this Court's statement in the criminal appeal that "the evidence introduced at trial established that the conspiracy netted approximately fifteen million dollars in excess profits." *Barnette I,* 800 F.2d at 1571–72. Because an appellate court does not find facts, *see, e.g., Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986), this Court's

previous statement must be read as upholding the $7 million restitution order on the ground that the evidence would have supported at least $15 million in restitution. Nowhere in that opinion did we intimate that the sentencing judge had found the loss to be only $7 million, and the opinion's assessment of the evidence is inconsistent with such a proposition.

Barnette also proffers a statutory argument for his contention that the sentencing judge determined the Government's total loss to be only $7 million. As Barnette notes, the VWPA requires a judge who orders partial restitution under the Act to explain on the record her reasons for not providing full restitution. 18 U.S.C.A. § 3663(a)(2) (1985), *repealed by* Pub.L. 99–646, § 8(b) (1986), *recodified at* 18 U.S.C.A. § 3553(c) (Supp. 1993); *see also United States v. Hairston,* 888 F.2d 1349, 1352 (11th Cir.1989) ("The VWPA does not explicitly require the court to assign reasons for its determination unless the court does not order restitution or orders only partial restitution."). Barnette asserts that the sentencing judge in his case did not offer such an explanation and therefore must have intended to award full restitution. Any other reading, he suggests, would require us to find that the sentencing judge violated her statutory duties.

Barnette's VWPA argument in unpersuasive. First, the VWPA does not clearly control this case. The sentencing judge imposed five concurrent $7 million restitution orders, of which we upheld four on direct appeal. *See Barnette I,* 800 F.2d at 1570–71. Three of those four restitution orders were for crimes that occurred before the effective date of the VWPA, and were therefore not governed by its provisions. As we have already implicitly held, *see id.* at 1570, those three restitution orders were each made pursuant to 18 U.S.C.A. § 3651 (1985 & Supp. 1993), *repealed by* Pub.L. 98–473, Title II, § 235(a)(1), 98 Stat. 2031 (Oct. 12 1984) (effective Nov. 1, 1987). Section 3651 did not require a judge to explain a less-than-full restitution order. Therefore, Barnette's statutory argument is inapposite with respect to three of the four concurrent restitution orders.

Although the remaining restitution order was subject to the VWPA, that might not have been apparent prior to our holding on appeal. *See Barnette,* 800 F.2d at 1571. At sentencing, the Government mistakenly stated that Barnette's crimes had been completed before the VWPA took effect. More specifically, counsel for the Government told the sentencing judge: "Congress recently passed a new law dealing with restitution .... That, of course, deals with the crimes that have occurred after the one that we have here. But I think it's instructive to note that Congress thinks that is an important part of the sentencing process in principle anyway." Neither the court nor Barnette contested the Government's assertion that the VWPA did not apply to the case. Indeed, it appears that Barnette based his direct appeal in part on his contention that the VWPA did not apply to the case. *See* 800 F.2d at 1571 (rejecting part of Barnette's appeal on the ground that the VWPA did apply). In light of this uncertainty at the time of sentencing, the sentencing judge may well have been unaware, just as the Government and Barnette were unaware, that the VWPA was applicable to any part of the case. If so, she would have felt no obligation under the VWPA to explain an award of less-than-full restitution.

The sentencing judge's own statements provide particularly strong evidence that she was unaware of any VWPA obligation. Shortly before ordering restitution, the judge expressly refused to determine the total amount of the Government's loss. We know that, had she been aware that the VWPA applied to any of the restitution counts, and of the resulting duty to explain less-than-full restitution, she would not have disavowed any intent to calculate the figure required for full restitution.

In any event, we are not at a loss to explain how the sentencing judge arrived at the $7 million figure at which she set restitution. The judge stated at sentencing: "The jury's verdict would support a finding that the proceeds from the crime were placed in the Old Dominion Corporation. Even the Defendant states that Old Dominion's worth is approximately six million five hundred

thousand dollars." Because Barnette owned a majority stake in Old Dominion, the judge's words suggest that she was estimating Barnette's financial resources. Indeed, when the judge's estimate of Old Dominion's value is factored into the presentence report's assessment of Barnette's known assets and liabilities, we discover that Barnette had a known net worth of between $7 and $8 million—approximately the amount of the restitution order. It is therefore reasonable to interpret the sentencing judge's comments as explaining that she was ordering $7 million in restitution because that was an amount that Barnette could pay.[2]

The district court clearly erred in determining that the sentencing judge had made a factual finding that the Government's loss from Barnette's crimes was only $7 million. The sentencing judge expressly disavowed such a finding, and neither the district court nor Barnette have offered any reason for us to doubt the sincerity of her disavowal. The record is wholly consistent with the expressed intention of the sentencing judge not to resolve the damages dispute.

2. Barnette's Double Jeopardy Claim

■ Barnette claims, and the district court held, that any civil penalties that the Government might win from Barnette in excess of the criminal restitution order would violate the Double Jeopardy Clause of the Fifth Amendment. We disagree.

Although civil actions for damages are by no means an unusual follow-up to criminal proceedings—and are expressly contemplated by the VWPA, see 18 U.S.C.A. § 3663(e)(2) (1985) (providing for offsets in civil actions of the amounts of restitution paid in criminal proceedings)—the Supreme Court has declared that there is a point beyond which civil penalties may become so punitive in nature as to violate the constitutional ban on subsequent punishments. The controlling law on this issue is found in *United*

*ed States v. Halper*, 490 U.S. 435, 448–50, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487 (1989). Under *Halper*, the question we must decide is whether the civil penalty sought by the Government from Barnette is so grossly disproportionate to the amount of loss suffered as to constitute deterrence or retribution instead of compensation. *Id.*

We are not now in a position to decide that question. As discussed in Part II.A.1, above, Barnette's sentencing judge never determined the total amount of the Government's loss, although she must have believed it to be at least $7 million. On direct appeal, we observed that the evidence presented at trial—which did not include evidence regarding the Government's investigation and prosecution costs—would have supported a finding that the loss was as high as $15 million. However, we did not then, and do not now, specifically determine the Government's direct loss or its total loss, which would include investigation and prosecution costs. It is not an appellate court's role to find facts. *E.g., Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986). That is a function of the district courts. Therefore, to the extent that the Government's complaint is not foreclosed on its face, we must remand for further fact finding. Of course, if *Halper* forecloses the Government from recovering the civil penalties it now seeks even if it did lose as much as it claims, then there is no point in remanding for what would be an irrelevant factual determination. The Government seeks between $18,570,153 and $50,525,279 (in direct loss damages, treble damages, and statutory penalties), plus costs. *See* Appendix. While we do not know the amount of the Government's investigation and prosecution costs, we can determine whether a total recovery of $50.5 million would violate the Double Jeopardy Clause, assuming the Government suffered at least $15,750,153 in direct damages, as it claims.

2. It may well be that this explanation by the sentencing judge would satisfy the VWPA, which in addition to an explanation of less-than-full restitution also requires that a judge, in setting restitution, "shall consider the ... financial resources of the defendant, ... and such other factors as the court deems appropriate." 18

U.S.C.A. § 3664(a) (1985 & Supp.1993). However, we need not decide whether the VWPA's explanation requirement was satisfied here. The only issue before us is whether the sentencing judge found the Government's total loss to be only $7 million. It is clear that she did not.

In *United States v. Halper,* a unanimous Supreme Court held that the Double Jeopardy Clause protects a defendant who has already been punished in a criminal prosecution from an additional civil sanction that is deterrent or retributive rather than remedial. 490 U.S. at 448–49, 109 S.Ct. at 1902. The defendant in *Halper* had submitted $585 in false Medicare claims, for which he already had been sentenced. 490 U.S. at 437, 109 S.Ct. at 1896. The Government then filed a civil case seeking an additional civil fine of $130,000 under the False Claims Act. 490 U.S. at 438, 109 S.Ct. at 1896. According to the trial court, the Government's total injury—including detection and investigation costs—totaled about $16,000. 490 U.S. at 439, 109 S.Ct. at 1897. The ratio between the total recovery sought and the Government's direct loss through the defendant's fraud was thus about 222 to 1. The ratio between the total recovery sought and the Government's total loss, including detection and investigation costs, was just over 8 to 1.

Faced with a "stark situation" in which the civil fine would have been "exponentially greater than the amount of the fraud" and "many times the amount of the Government's total loss," the Supreme Court balked. 490 U.S. at 445, 109 S.Ct. at 1900. On these facts, the Court held, the "supposedly remedial sanction ... [did] not remotely approximate the Government's damages and actual costs," and "rough justice [had become] clear injustice." 490 U.S. at 446, 109 S.Ct. at 1901. Since Halper had already been tried and sentenced for the same activities, the Court ruled that a $130,000 fine would violate the constitutional prohibition on subsequent punishments. 490 U.S. at 448–49, 109 S.Ct. at 1902. More generally, the Supreme Court held that "if a civil penalty sought in [a] subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss," but is instead punitive, "then the defendant is entitled to an accounting of the Government's damages and costs to determine ... the size of the civil sanction the Government may receive without crossing the line between remedy and punishment." 490 U.S. at 449–50, 109 S.Ct. at 1902; *see also United States v. Mayers,* 897 F.2d 1126, 1127 (11th Cir.), *cert. denied,* 498 U.S.

865, 111 S.Ct. 178, 112 L.Ed.2d 142 (1990) (holding that the Double Jeopardy Clause may be triggered when a "civil penalty ... rose to the level of criminal punishment because of the lack of rational relation to the Government's loss").

Nevertheless, the *Halper* Court carefully limited its holding, which it called "a rule for the rare case." 490 U.S. at 449, 109 S.Ct. at 1902. The Court emphatically denied any intention to limit the Government to the recovery of direct damages, exclusive of ancillary costs. On the contrary, the Court explicitly "recognized that in the ordinary case fixed-penalty-plus-double-damages provisions can be said to do no more than make the Government whole." *Id.* It considered such formulas a necessary aspect of "rough justice." *Id.* Echoing this point in concurrence, Justice Kennedy noted that "[o]ur rule permits the imposition in the ordinary case of *at least* a fixed penalty roughly proportionate to the damage caused or a reasonably liquidated amount, plus double damages." 490 U.S. at 452–53, 109 S.Ct. at 1904 (emphasis added).

Despite the undeniably large sums at stake, the present case is "ordinary" as that term was used in *Halper.* Here, unlike in *Halper,* the civil penalty is not exponentially exaggerated by a fixed penalty disproportionate to the defendant's actual fraud. Assuming that the Government can prove that it has lost as much as it claims, even an award of $50.5 million in restitution against Barnette would not constitute a second punishment violative of the Double Jeopardy Clause. If the Government is correct that Barnette's fraud caused the Government $15.75 million in direct loss, then the ratio between the amount that the Government is seeking and its direct loss is only 3.2 to 1— strikingly less than the 222 to 1 figure that so shocked the *Halper* Court. Because the Government has not averred the amount of its investigation and prosecution costs, we cannot determine the ratio between the total recovery sought here and the Government's total loss, including those costs. It is clear, however, that this ratio would not exceed 3.2 to 1 even if there were no ancillary costs. In other words, the ratio in this case between

the total recovery sought and the Government's total loss will never approach *Halper*'s 8 to 1 ratio. And a 3.2 to 1 ratio simply does not lack a "rational relation to the Government's loss." *Mayers*, 897 F.2d at 1127. Instead, such a ratio is very close to "a fixed penalty roughly proportionate to the damage caused ... plus double damages." *Halper*, 490 U.S. at 452–53, 109 S.Ct. at 1904 (Kennedy, J., concurring). The rule of *Halper* permits "at least" that much. 490 U.S. at 453, 109 S.Ct. at 1904.

Seeking refuge from the result of a proportionality analysis, Barnette also contends that in a case of this magnitude we should consider the *absolute* amount by which the total recovery sought exceeds the Government's total loss, rather than a ratio of these figures. We do not dispute that the amounts claimed by the Government are large, but they are not disproportionate, and proportionality is the key. In a case in which the plaintiff sought penalties of $13 *billion*, Justice Stevens observed:

> [T]he exceptional magnitude of those consequences is the product of the vast size of Texaco itself ... and the immensity of the transaction that gave rise to this unusual litigation. The character of harm that may flow from this litigation is not different from that suffered by other defeated litigants, their families, their employees, and their customers. The price of evenhanded administration of justice is especially high in some cases, but our duty to deal equally with the rich and the poor does not admit of a special exemption for multi-billion-dollar corporations or transactions.

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 34, 107 S.Ct. 1519, 1538, 95 L.Ed.2d 1 (1987) (Stevens, J., concurring). We agree. The Constitution does not have two sets of provisions, one that operates at retail and another at wholesale. It offers no quantity discounts. The protections of the Bill of Rights apply the same regardless of the size of the crime or the identity of the criminal.

The present case is about remedies, and whether the Constitution permits the remedy the Government seeks. The Government claims to have suffered at Barnette's hands losses significantly in excess of the amount he paid in restitution. By granting Barnette's motion for summary judgment, the district court precluded the Government from proving its claim. When faced with an analogous situation, the *Halper* Court remanded to allow the Government to present an accounting of its total loss. *Halper*, 490 U.S. at 452, 109 S.Ct. at 1903. Similarly, we now remand this case to the district court to allow the Government to demonstrate its total loss. *Cf. Mayers*, 897 F.2d at 1127 (remanding under *Halper* for a factual determination of the Government's loss). The Government is entitled to introduce evidence regarding "not merely the amount of the fraud itself, but also ancillary costs, such as the costs of detection and investigation, that routinely attend the Government's efforts to root out deceptive practices directed at the public purse." *Halper*, 490 U.S. at 445, 109 S.Ct. at 1900.[3] If the district court finds that the Government's total loss was $15.75 million, which is the amount it claims in direct loss alone, then a recovery of $50.5 million in damages (offset by the $7 million Barnette already paid in restitution) is not barred by the Double Jeopardy Clause. If the Government proves a lesser amount of total loss, than the district court should apply to its fact findings the same *Halper* analysis that we have applied in this opinion.

## B. COLLATERAL ESTOPPEL

Barnette asserts that the doctrine of collateral estoppel bars the Government's civil damages action against him. That doctrine only precludes "relitigation of an issue of fact

---

**3.** We believe that *Halper*'s broad description of ancillary costs includes the cost of prosecution, which in this case must have been substantial, as well as the cost of detection and investigation. The Court used illustrative ("such as") language instead of limiting language, and the cost of prosecution does "routinely attend the Government's efforts to root out deceptive practices." *See Halper*, 490 U.S. at 445, 109 S.Ct. at 1900. For these reasons, the district court should consider as part of the Government's total loss the cost of prosecution, if the Government proves that cost.

or law that has been litigated and decided in a prior suit." *I.A. Durbin, Inc. v. Jefferson Nat'l Bank,* 793 F.2d 1541, 1549 (11th Cir. 1986). Here, because the sentencing judge never determined the amount of the Government's loss, the doctrine of collateral estoppel is completely inapposite. We therefore need not determine if this case presents one of those rare exceptions to the general rule that collateral estoppel does not apply to the United States. *See, e.g., United States v. Killough,* 848 F.2d 1523, 1526 (11th Cir.1988).

## C. RES JUDICATA

■ Barnette asserts that the present action is barred under principles of res judicata. "[A] federal court must apply federal law to determine the preclusive effect of a prior federal court decision." *Citibank, N.A. v. Data Lease Fin. Corp.,* 904 F.2d 1498, 1501 (11th Cir.1990). The doctrine of res judicata in federal law prohibits "the filing of claims which were raised or could have been raised in an earlier proceeding." *Id.* Barnette asserts that because the Government could have brought its civil claims as part of the criminal trial, res judicata bars this suit.

We have some doubts about the Government's ability to bring civil claims as part of a criminal proceeding. Barnette contends that *Halper* allows such a mixed action, but he points to no statutory authorization for a hybrid proceeding of that sort. *Halper* says only that the ruling in that case does not prevent imposition of a civil penalty in a criminal trial. 490 U.S. at 450, 109 S.Ct. at 1903. We hardly think that this passing dicta renders moot other obstacles to such hybrid proceedings. These obstacles are one reason that the doctrine of res judicata often has been held not to bar a civil case brought subsequent to a criminal trial. *Cf., e.g., Standefer v. United States,* 447 U.S. 10, 23 & n. 18, 100 S.Ct. 1999, 2007 & n. 18, 64 L.Ed.2d 689 (1980) (holding that a "not guilty" verdict does not estop the Government in a subsequent civil case because, *inter alia,* "the prosecution's discovery rights in criminal cases are limited"); *Helvering v.*

*Mitchell,* 303 U.S. 391, 397, 58 S.Ct. 630, 632, 82 L.Ed. 917 (1938) ("The difference in degree of the burden of proof in criminal and civil cases precludes application of the doctrine of *res judicata.*"). Furthermore, Barnette's res judicata theory ignores the result of *Halper* itself. There, the Supreme Court remanded a civil case for further fact finding in order to determine whether a civil remedy would be permitted, despite the fact that the defendant had already been prosecuted for the same conduct. *See Halper,* 490 U.S. at 452, 109 S.Ct. 1904. Under Barnette's reading of the *Halper* case, the *Halper* action itself would have been barred by res judicata. Yet the Supreme Court never mentioned that possibility. We will not interpret and apply dicta in a Supreme Court decision in a way that is inconsistent with the disposition reached in that very decision.

Moreover, the VWPA expressly contemplates civil restitution claims brought subsequent to a criminal conviction. *See* 18 U.S.C.A. § 3579(e)(2) (1985). Barnette's approach would require us to render this provision of the VWPA irrelevant. The courts should not jam judicially created doctrines such as res judicata into the gears of Congress' carefully crafted statutory machinery.

There is one last reason to reject Barnette's res judicata defense. At sentencing, Barnette asserted that the Government was also seeking to recover its loss through a civil action, and he argued that a restitution order would unfairly make him pay twice. After Barnette made that argument, the sentencing judge did not award as much restitution as the Government had requested. We will not now permit Barnette to defeat the Government's unsatisfied damages claims on the ground that the Government has already had one bite at the apple. To do so, in view of the arguments Barnette used during sentencing to reduce the amount of restitution, would allow him to have the Government's apple and eat it too.

In a related vein, Barnette points out that the district court seems to have based its summary judgment order in part on the Gov-

ernment's failure to appeal the prior restitution award. The district court did not indicate why it attached any legal significance to this fact. Whatever the court's reasoning, it assumed without discussion that the Government *could* have appealed. That is not at all clear to us, because three of the four restitution counts we upheld against Barnette's challenge on direct appeal were based on pre-VWPA law. Moreover, as we have already discussed, the doctrine of res judicata is not applicable in this case for other reasons. For those same reasons, it would not have been applicable even if the Government had attempted to appeal the restitution order. There is no basis in law or logic for saying that res judicata would not apply if the Government had attempted to appeal the restitution order, but that it does apply because the Government did not appeal. That is, however, essentially what Barnette contends when he argues that res judicata is applicable because the Government did not attempt to appeal the restitution order. Finally, we note that Barnette has not cited any case from any jurisdiction that even hints that a prior criminal restitution order is res judicata against a subsequent damages action, regardless of whether the Government attempted to appeal the restitution order. We decline to be the first court to misapply the doctrine of res judicata in such a fashion.

## D. THE GOVERNMENT'S PRAYER FOR INJUNCTIVE RELIEF

Seven of the eight counts in the Government's second amended complaint sought monetary relief. *See* Appendix. Count Two, however, sought an injunction. The district court did not explain its rationale for granting summary judgment on this count. To the extent that the district court rested its order as to Count Two on the same rationale that it applied to the Government's other claims, we reverse and remand for reasons already discussed. To the extent that summary judgment on Count Two was based on some unarticulated—and thus unreviewable—rationale, we must still remand for a specification of grounds. On remand, the district court will be free to reconsider Barnette's summary judgment motion as to this count. However, if the district court re-enters summary judgment on Count Two, it should specify its grounds.

## III. CONCLUSION

We REVERSE the district court's order granting Barnette summary judgment and REMAND this case for further proceedings consistent with this opinion.

## APPENDIX:
## RELIEF SOUGHT BY PLAINTIFF UNITED STATES OF AMERICA

| Count | ¶ | Brief Description of Claim | Relief Sought |
|---|---|---|---|
| 1 | 33 | RICO treble damages claim relating to laundry contract | $47,250,459: (three times alleged damages of "at least $15,750,153"), plus costs and fees |
| 2 | 37 | RICO injunctive relief claim relating to laundry contract | Order dissolving or reorganizing corporate defendants, barring certain individual defendants from holding interest in or exercising control over corporate defendants, and prohibiting certain defendants from bidding on Government contracts for a reasonable period |

| 3 | 61 | False Claims Act claim relating to laundry contract | $50,070,459: $47,250,459 (trebled damages), plus $2,820,000 in civil penalties ($10,000 for each of 282 false claims), plus costs |
|---|---|---|---|
| 4 | 67 | False Claims Act conspiracy claim relating to laundry contract | $18,570,153: $15,750,153 (single damages), plus $2,820,000 (civil penalties), plus costs |
| 5 | 71 | Breach of contract claim relating to laundry contract | $47,250,459: (trebled damages), plus costs |
| 6 | 78 | Unjust enrichment claim relating to laundry contract and Small Business Administration (SBA) contracts | $18,141,309: $15,750,153 (single damages), plus $2,391,156 (profits under SBA set-aside contracts to which defendants were not entitled), plus costs |
| 7 | 82 | Payment by mistake claim relating to laundry contract and SBA contracts | $18,141,309: $15,750,153 (single damages), plus $2,391,156 (profits under SBA set-aside contracts to which defendants were not entitled), plus costs |
| 8 | 92 | Contract annulment claim relating to laundry contract | $50,525,279: (gross amount of plaintiff's payments on contract modifications and extensions), plus costs |