United States Court of Appeals,

Eleventh Circuit.

No. 94-3563.

UNITED STATES of America, Plaintiff-Appellee,

v.

Thomas J. TWITTY;  John E. Watson, a.k.a. Jack Watson;  John P. Larrison, a.k.a. Jack Larrison;  G. Richard Leveritt, Defendants-Appellants.

March 21, 1997.

Appeal from the United States District Court for the Middle District of Florida.  (No. 92-64-CR0T-25A), Henry Lee Adams, Jr., District Judge.

Before EDMONDSON and BLACK, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

Appellants were convicted of conspiracy and bank fraud.  Two appellants were also convicted of money laundering.  For the following reasons, we affirm each appellant's conviction and sentence.

I. BACKGROUND

Thomas J. Twitty, John E. Watson, G. Richard Leveritt, and John P. Larrison were partners in a joint venture to develop a real estate project in Pinellas County, Florida, called "Hamlin's Landing."  The development included office/commercial space, retail space, a marina, a restaurant, and time-share condominiums.  On March 6, 1985, Twitty and Larrison signed a Real Estate Mortgage Loan Application and submitted it to Freedom Federal Savings and Loan Association (Freedom) to obtain financing for the project.  The application stated that "[t]he 42 condominiums must be 50% pre-sold prior to closing with minimum 10% non-refundable binders."

On April 9, 1985, Twitty submitted a status report to Freedom showing the names of the "purchasers" of the condominium units. The list showed twenty contracts in the name of Jewel Roome, ten in the name of Dr. Neil Feldman, and two in appellant Watson's name. On April 22, 1985, Twitty wrote Freedom stating:

> Thirty-nine (39) out of 42 units are presently contracted for. The response from our advertising indicates a strong market for our townhome product from the financially independently secure as to a viable place to own and live and do business. The entrepreneur has shown strong interest of locating home and business to (sic) together at this location.

On May 2, 1985, Freedom issued a commitment letter in which it agreed to lend the joint venture money to build Hamlin's Landing, but only if Twitty and the others promised to meet certain conditions. Chief among the conditions was the pre-sale of twenty-one of the proposed forty-two condominiums in binding, non-contingent contracts, to bona fide third parties, with ten percent down payments. Group sales would count only half the number of actual units sold. Freedom also required that 100% of the sales price on each condominium be paid to it before Freedom would release its hold on that condominium.

The evidence at trial was that Roome and Feldman were not bona fide purchasers. Each was induced to sign purchase agreements for condominiums, but was told that they would never have to close on the contracts. They were told that the joint venture would arrange, guarantee, and pay all costs associated with the contracts and any debts Roome and Feldman might incur in making the down payments on the contracts. They were each rewarded with a discount toward the purchase of a $120,000 partnership unit in Hamlin's Partners, Ltd.

Sometime in the spring of 1985, Roome consulted with a lawyer who advised her to rescind her twenty purchase agreements. Her counsel contacted Watson and demanded that the joint venture rescind Roome's contracts, threatening to contact Freedom directly. On June 3, 1985, Watson agreed to rescind Roome's purchases.

On June 5, 1985, Twitty's counsel sent Freedom another status report still showing Roome contracting to buy twenty condominium units. At another meeting later in June, Twitty assured Freedom that Roome actually was planning to close on her twenty condominiums and that she had the financial ability to do so.

Without Roome's twenty contracts, the joint venture did not have enough pre-sales to satisfy the conditions set by Freedom for the financing. The loan was set to close in July of 1985. Larrison went to Watson's law firm and offered to pay people working in the firm to sign the pre-sale contracts. He recruited three lawyers and the office manager and offered each $5000 to sign on as a straw purchaser. Each was promised he would not have to incur any expenses, that a loan would be arranged to pay the down payment, and that he would not have to close on the unit. Each executed a purchase contract and received a $5000 payment drawn on a bank account controlled by Leveritt. Subsequently, one of the lawyers refused to go through with the deal, telling Larrison that he thought the submission of the "purchase agreements" to Freedom would constitute bank fraud.

Twitty sent Freedom another status report on July 15, 1985, shortly before the July 31, 1985, scheduled loan closing. By this time, Roome's name was off the list, but the list included the

names of the people from Watson's law firm and others who had side agreements to sign over the purchase contracts to the partnership at its direction. Twitty represented that these purchasers had placed or would place cash deposits, although in fact the defendants, themselves, had funded the down payments.

On July 31, 1985, the loan closed. Twitty and Larrison signed the Loan Agreement. They represented to Freedom in the Agreement that the borrowers had not defaulted under any of the loan documents and that they knew of no event of default that would occur after the passage of time. The Agreement defined "event of default" to include the borrowers' failure to perform any condition in the Loan Agreement or other loan documents. Freedom was not aware of the side agreements and did not know that the partnership had "fronted" the down payments on the pre-sale contracts.

Freedom required the borrowers to place $1 million of the loan proceeds in a collateral account at Freedom. The borrowers had agreed to allow Freedom to hold $620,000 of that amount until the condominium loan of $6.2 million was repaid. The borrowers were permitted to draw against the remaining $380,000 for cost overruns in the project. For the borrowers to withdraw money from the account, at least one representative from Freedom had to endorse the request.

In early 1987, only the $620,000 remained in the collateral account. In February of 1987, Twitty and Larrison went to a branch office of Freedom and changed the signature card to show that only Twitty and Larrison were required to sign to withdraw funds from the collateral account. Then, on March 2, 1987, they withdrew

$520,000 from the account, contrary to the terms of their agreement with Freedom.

Some time later, Twitty, Larrison, Watson, and Leveritt contacted the straw purchasers and directed them to write letters to Freedom asking to rescind their purchase contracts. Upon Twitty's authorization, the escrow agent returned the down payment money to the partnership, not to the alleged purchasers.

After Hamlin's Landing was completed, the borrowers never repaid any of the $6.2 million they were supposed to recover from the sale of the condominiums. In 1988, Freedom filed an action to foreclose on the development. Then Freedom itself went into receivership. The Resolution Trust Corporation (RTC) took it over, and substituted itself as plaintiff in the foreclosure action.

On April 10, 1992, a federal grand jury returned a five-count Superseding Indictment charging Twitty, Watson, Leveritt, and Larrison with making false statements to a financial institution and bank fraud. After many months, the defendants mounted a successful challenge to the indictment based upon the theory that the charges were duplicitous.

On March 31, 1994, the grand jury returned a Second Superseding Indictment against the defendants. This indictment charged each of the defendants with one count of conspiracy to make knowingly false statements to a federally insured financial institution and executing a scheme to defraud a federally insured institution (18 U.S.C. § 371). The defendants were also charged with one count of knowingly executing and attempting to execute a scheme to defraud a financial institution, and obtaining funds from

that institution by false or fraudulent representations (18 U.S.C. §§ 2 and 1344).  Finally, Twitty and Larrison were each charged with five counts of money laundering (18 U.S.C. §§ 2 and 1957).

In May of 1992, each of the defendants executed a waiver of his right to a speedy trial.  Twitty, Watson, and Larrison each executed an indefinite speedy trial waiver;  Leveritt waived his right to a speedy trial through November 1992.  The trial began May 9, 1994.  Each defendant was convicted on all counts.  At sentencing, the district court ordered each to pay restitution.[1]

Appellants raise many issues on appeal.  We find no merit in most of these issues.[2]  We address the issues of denial of speedy trial as to Leveritt;  sufficiency of the evidence as to each appellant's intent to defraud;  and the sufficiency of the restitution orders.

## II. DISCUSSION

A. *Leveritt's Right to Speedy Trial*

1. Leveritt's Statutory Right

The Speedy Trial Act requires that the trial of any indicted defendant commence within seventy days from the later of either the filing date of the indictment or the date on which the defendant

---

[1]Twitty and Larrison each received eighteen months incarceration.  The district court sentenced Leveritt to three years probation, and Watson to six months home confinement and three years probation.

[2]These issues include:  whether the prosecution violated the ex post facto clause;  whether the prosecution was barred by res judicata;  whether the district court erred in several of its evidentiary rulings;  whether the second superseding indictment was multiplicitous;  whether the jury instruction on the money laundering counts was erroneous;  and whether effective assistance of counsel was denied.  As we find no merit in any of these issues, we do not discuss them.

first appears before the court in which that case is pending. 18 U.S.C. § 3161(c)(1). The period of delay "resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excluded from the computation of this seventy-day limit. § 3161(h)(1)(F). The day that a pretrial motion is filed and the day on which the motion is decided by the court are excluded from the seventy-day clock. *United States v. Elkins,* 795 F.2d 919, 924 n. 1 (11th Cir.), *cert. denied,* 479 U.S. 952, 107 S.Ct. 443, 93 L.Ed.2d 391 (1986). Delays resulting from co-defendants' motions are excludable time as to each co-defendant. *United States v. Mejia,* 82 F.3d 1032, 1035 (11th Cir.1996); *United States v. Sarro,* 742 F.2d 1286 (11th Cir.1984). Section 3161(h)(8)(A) also excludes any period of delay resulting from a continuance granted by a judge at the request of a defendant or his counsel if the continuance serves the "ends of justice." We review a claim under the Speedy Trial Act *de novo. United States v. Vasser,* 916 F.2d 624 (11th Cir.1990), *cert. denied* 500 U.S. 907, 111 S.Ct. 1688, 114 L.Ed.2d 82 (1991).

Leveritt waived both his statutory and constitutional rights to a speedy trial through November 1992. The speedy trial clock was set to start running for him, therefore, on December 1, 1992.[3] On November 19, 1992, however, the government filed a motion for continuance based upon the illness of an essential witness.[4] The

_____

[3]The time prior to Leveritt's waiver is also excludable because Larrison filed a discovery motion prior to Leveritt's arraignment, which stopped the speedy-trial clock.

[4]The witness had a viral infection in a heart valve.

government requested a six-week continuance. The district court granted the continuance the same day, but set no definite length, stating, "[t]he need for a continuance outweighs the defendants' interest in a speedy trial. This case will be set for trial by future order."

No party requested the court to set a new trial date until May 5, 1993, when the government moved the court to set trial for a date certain in July or August. Watson responded, objecting to these dates and requesting that trial not be set prior to September 20, 1993. Larrison also moved the court to set trial after September 20, 1993. Both cited the unavailability of their counsel prior to that time and the need for time to prepare for trial. The district court did not enter a written order, but neither did it set the trial on the July or August calendars.[5]

On September 15, 1993, Twitty filed another pretrial motion. This motion prevented the speedy trial clock from re-starting on September 20. The motion remained under advisement when, on September 27, 1993, Larrison filed a notice of supplemental authority in support of his previous motions to dismiss. Because the court permitted Larrison to file this authority, the government had ten days to respond, and the motion was under advisement for

---

[5]Section 3161(h)(8)(A) excludes any period of delay resulting from a continuance granted by a judge at the request of a defendant or his counsel if the continuance serves the "ends of justice." Although the district court did not cite any reasons for granting these requests, the grounds cited in the motions plus the court's grant of a continuance as requested support the inference that the continued delay was to serve the ends of justice. *See Elkins,* 795 F.2d at 923 (despite lack of written order on defendant's motion for continuance, record was sufficient for court to determine that the continuance was granted in the "ends of justice").

thirty days after that.  *See United States v. Davenport,* 935 F.2d 1223, 1228-29 (11th Cir.1991) (time in which the court authorizes the filing of supplemental materials is excluded without regard to its reasonableness because matter not yet under advisement).  Thus, the speedy trial clock remained stopped from September 15 through November 6, 1993.  Since November 6 was a Saturday, the clock was stopped through Monday, November 8, 1993.

The government concedes that one non-excludable day passed on November 9, 1993.  Then, on November 10, Twitty filed another pretrial motion stopping the clock again.  This motion remained under advisement when the government filed a motion on December 10 and when Larrison's counsel moved to withdraw on December 13. Larrison's motion was granted on December 15 and the government's was resolved on December 22.

At this point, the speedy trial clock began to tick again and twenty-two days elapsed before the government filed an *in camera* application for an *ex parte* order on January 14, 1994.  This motion remained under advisement when Larrison moved to consolidate counts four through eight on January 24, 1994.  Larrison's motion to consolidate was under advisement when Larrison moved for a continuance on February 15, 1994.  Larrison asked for the trial to be continued to the October 1994 trial calendar.  On February 18, 1994, the district court granted Larrison's motion, finding that because Larrison's counsel was newly-appointed, the ends of justice served by granting the motion outweighed the defendants' interest in a speedy trial.  The court set the trial for the May 1994 trial term, and the case actually went to trial on May 9, 1994.

The maximum number of non-excludable days which passed between May 5, 1993, and the start of Leveritt's trial was thirty-three.[6] This leaves thirty-seven days within the seventy-day limit. The initial continuance, which lasted from December 1, 1992, until May 5, 1993, substantially exceeds thirty-seven days. Unless this period of time is excludable,[7] Leveritt's statutory right to a speedy trial was denied.

The district court's order granting the government's motion for a continuance stated:

> Presently, the government seeks a continuance on the basis of the ill health of an essential witness. Upon review of the government's motion, the Court finds that the testimony of Neil T. Feldman is essential ... and ... (he) is unavailable to testify due to serious illness. The Court therefore finds that the need for continuance outweighs the defendants' interest in a speedy trial. This case will be set on a trial calendar by future order.

There is no dispute that the district court made the required determination that the ends of justice would be served by granting the continuance. Leveritt argues, however, that the excludable length of the continuance was only the six-week period requested in the government's motion. If so, the non-excludable portion of the continuance would exceed the thirty-seven days remaining on the speedy trial clock.

The district court, however, stated that it would set the

---

[6]The government maintains that only 23 non-excludable days passed, but Leveritt disputes the government's contention that its filing of an *in camera* application for an *ex parte* order stopped the clock for ten days under § 3161(h)(1)(F). We do not reach this dispute because its resolution would not affect the outcome.

[7]Alternatively, at least all but thirty-seven days must be excludable time.

trial "by future order."  This is an open-ended, not merely a six-week, continuance.  An open-ended continuance may be granted to serve the ends of justice.  We have held:

> There is no fixed limit to the amount of time that may be excluded under the ends of justice provision.  The provision excludes "*any* period of delay resulting from a continuance...."  § 3161(h)(8)(A) (emphasis added).

*Vasser,* 916 F.2d at 627.  If the trial court determines that the "ends of justice" require the grant of a continuance, and makes the required findings, *any* delay is excludable under § 3161(h)(8)(A) of the Speedy Trial Act.  *See Elkins,* 795 F.2d at 923.

Although "a defendant has no duty to bring himself to trial," *Barker v. Wingo,* 407 U.S. 514, 527, 92 S.Ct. 2182, 2190, 33 L.Ed.2d 101 (1972), Leveritt could have objected to the delay caused by the open-ended nature of the continuance, but did not.  *Cf. Mejia,* 82 F.3d at 1036 (upholding open-ended continuance and noting defendant could have objected).  The length of the delay resulting from the continuance in this case does not constitute a *per se* violation of the Speedy Trial Act, nor is it unprecedented.  *See e.g., Davenport,* 935 F.2d at 1228-29 (six-month delay excludable); *United States v. DiTommaso,* 817 F.2d 201, 210 (2nd Cir.1987) (seven-week delay excludable); *United States v. Savoca,* 739 F.2d 220, 223 (6th Cir.1984) (six-month delay excludable).[8]

---

[8]We note that on May 5 when the government notified the court that the continuance was no longer necessary and moved to set the trial for a date certain in July or August, Watson and Larrison filed motions requesting the court not to set trial before September 20.  Leveritt filed no objection to these motions.  We infer from this series of events that, at the time, Leveritt did not find the continuance to be unreasonable.  In fact, by his actions he indicated to the court that a further continuance would be reasonable.

Accordingly, we hold that the continuance granted on November 19, 1992, served to exclude all time until May 5, 1993, when the government moved the district court to set the case for trial.

As only a maximum of thirty-three non-excludable days elapsed between the defendants' indictment and the start of trial, Leveritt's prosecution did not violate his rights under the Speedy Trial Act.

2. Leveritt's Constitutional Right

Leveritt claims that the delay in this case violates his right under the Sixth Amendment to a speedy trial. A delay of sufficient length may be a constitutional violation, even though it is not a violation of the Speedy Trial Act. *United States v. Beard,* 41 F.3d 1486, 1488 n. 6 (11th Cir.1995). Although compliance with the Speedy Trial Act does not bar Sixth Amendment speedy trial claims, "it will be an unusual case in which time limits of the Speedy Trial Act have been met but the Sixth Amendment right to a speedy trial has been violated." *United States v. Nance,* 666 F.2d 353, 361 (11th Cir.1982), *cert. denied,* 456 U.S. 918, 102 S.Ct. 1776, 72 L.Ed.2d 179 (1982).

Four factors underlie a constitutional claim of denial of speedy trial: the length of the delay, the reason for the delay, the defendant's assertion of his or her right to a speedy trial, and the prejudice to the defendant. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. The length of the delay must be "presumptively prejudicial" to trigger an inquiry into the other three factors. *Ringstaff v. Howard,* 885 F.2d 1542 (11th Cir.1989), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990).

In this case, more than two years elapsed between Leveritt's indictment and the beginning of his trial. This amount of time is sufficient to trigger inquiry into the other three *Barker* factors.

Leveritt suggests that the delay in this case was the result of the government's and the district court's negligent failure to monitor the case. The record reveals that the delay was the result of: numerous pretrial motions; the illness of an essential government witness; Larrison's substitution of counsel;[9] and scheduling conflicts resulting in the unavailability of certain defense counsel. There is no suggestion that the delay was due to the bad faith or dilatory purpose of the government. Nor was the illness of the government's witness under its control. The unavailability of certain defense counsel cannot be charged to the government. Therefore, the reasons for the delay in this case do not militate in favor of finding a violation of the Sixth Amendment. *See United States v. Loud Hawk,* 474 U.S. 302, 316, 106 S.Ct. 648, 656-57, 88 L.Ed.2d 640 (1986).

Furthermore, Leveritt did not assert his right to a speedy trial in a timely fashion. He filed his motion to dismiss on the day trial was to begin. The failure to assert the constitutional right to speedy trial is weighed heavily against the defendant. *Doggett v. United States,* 505 U.S. 647, 653, 112 S.Ct. 2686, 2691, 120 L.Ed.2d 520 (1992). At no time did Leveritt object to any continuance granted, nor to co-defendants' motions requesting additional delay. Neither did he request severance so that he

---

[9]Larrison's original counsel was appointed to the state court bench.

could proceed to trial more speedily.  Only on the day of trial, did Leveritt seek to escape prosecution based upon the length of these delays.  This factor, also, then, militates against finding a constitutional violation.

Finally, Leveritt fails to identify any actual prejudice he suffered from the delay, relying instead on an argument that the two-year delay presumptively prejudiced his defense.  While it is true that "affirmative proof of particularized prejudice is not essential to every speedy trial claim," *Doggett,* 505 U.S. at 655, 112 S.Ct. at 2692, where the other factors do not indicate a constitutional violation, a defendant must show he suffered actual prejudice from the delay.  *See Loud Hawk,* 474 U.S. at 316, 106 S.Ct. at 656-57.  Leveritt's failure to do so does not support his claim.

The government was neither negligent nor purposefully dilatory in this prosecution.  Leveritt failed both to assert his constitutional speedy trial right in a timely fashion and to identify actual prejudice to his defense from the delay in this case.  Accordingly, we hold the Sixth Amendment was not offended by his prosecution.

B. *Sufficiency of the Evidence*

Appellants were convicted of making false representations to Freedom.  The government based its case upon the theory that the representations made to Freedom concerning pre-sales of the condominiums were false.  Paragraph 15(c) of the Commitment Letter sent by Freedom to Twitty provided:

> At least ten (10) days prior to closing, Borrower shall submit
> evidence satisfactory to Freedom that Borrower has entered

into binding non-contingent contracts for sale with bona fide third party purchasers for at least twenty-one of the condominiums to be built with the proceeds of this loan. Freedom shall have the right to review the terms of the contracts. All such contracts for sale shall be accompanied by a deposit of no less than ten percent (10%) of the sales price, which shall be placed in an escrow account with Freedom. In meeting this pre-sale requirement, Borrower will be given credit for only fifty (50%) of the units purchased by any person or entity which purchases more than one unit.

The charges against the defendants were based upon the government's contention that they intentionally defrauded Freedom by deliberately misrepresenting that they met the terms of this paragraph, *i.e.,* that they, in fact, had entered into "binding non-contingent contracts for sale with bona fide third party purchasers for at least twenty-one of the condominiums." The government sought to prove its case by introducing evidence that appellants recruited and induced people to execute purported purchase agreements for condominiums by: (1) either making the down payments for them or guaranteeing loans to them for that purpose; (2) promising these "purchasers" they would not sustain any out-of-pocket expenses; (3) giving them cash payments of $5,000 to execute purchase agreements; (4) promising them they would never have to close on the purchase agreements; and (5) offering them attractive opportunities to obtain participation in the enterprise.

Appellants contend that, even if all this evidence is credited, the government still has not proved its case because the evidence does not establish the specific intent to defraud required by the statute. Appellants argue that the evidence was that the pre-sale requirements found in Paragraph 15(c) were merely aspirational, contained vague terms, and were, in any event,

considered immaterial and waived by Freedom. Furthermore, appellants argue that even under the government's interpretation of Paragraph 15(c), appellants made no misrepresentations as Freedom could have and should have discovered all the facts proven at trial by making its own pre-loan inquiries. The sufficiency of the evidence is an issue of law subject to *de novo* review. *United States v. Smith,* 918 F.2d 1551, 1564 (11th Cir.1990).

At the outset, we reject the argument that, at the most, what appellants did in this case amounts to non-disclosure, which does not satisfy the statutory requirements to constitute the offense. What appellants did[10] was to represent to Freedom that they met the conditions set out in Paragraph 15(c). This is more than non-disclosure. This is an active misrepresentation unless, as appellants also claim, the conditions set out in Paragraph 15(c) were either so vague that appellants cannot be said to have violated them, or immaterial to the bank and waived by it.

---

[10]We also reject Watson's contention that, because the evidence did not show that he himself actually made false statements to Freedom, he is not guilty of the offense. Watson was indicted under 18 U.S.C. § 2, which renders him guilty as a principal if he aided, abetted, or counseled the commission of the fraud against Freedom. The government also charged Watson with conspiracy. The conspiracy charge required the government to prove that the conspiracy existed, that the defendants knew of the conspiracy, and that they voluntarily joined in the conspiracy. *United States v. Hernandez,* 896 F.2d 513 (11th Cir.), *cert. denied,* 498 U.S. 858, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990). All the government need prove to establish the offenses charged in this case is that Watson knew that some financial institution was lending money for financing of the condominium project, knew that down payments were required in connection with the loans, knew that a scheme of some sort existed to make it appear the down payments were being made, when, in fact, they were not, and that he willfully participated in the scheme. *United States v. Brandon,* 17 F.3d 409 (1st Cir.1994). Proof of participation in each and every act in furtherance of the conspiracy is not necessary. *Id.*

The crux of appellants' argument as to Paragraph 15(c) is that the term "bona fide" purchaser was not defined, was interpreted differently by various Freedom loan officers in their testimony at trial, and, therefore, would not exclude their purchasers. If their actions amounted to representations to Freedom that they met the conditions contained in Paragraph 15(c), they argue this was not a misrepresentation.

Appellants base this argument on their theory that Paragraph 15(c) did not require the purchasers to put up their *own* money as a down payment, and could not require the "purchasers" actually to close on their condominiums. Failure to close might forfeit the purchasers' deposits, but nothing more. Appellants conclude from this that they made no misrepresentations to Freedom; with appellants' straw-purchasers, Freedom was in exactly the same position it would have been with non-straw-purchasers who originally intended to close and subsequently changed their minds.

The evidence at trial, however, was that appellants knew that the purpose of Paragraph 15(c) was to enable Freedom to evaluate the demand for the condominiums prior to loaning money to appellants. The fact that Freedom might not have been able to enforce the pre-sale purchase agreements is not relevant. What mattered to Freedom was that the purported purchasers be "bona fide" third parties willing to put up a ten percent down payment which would be forfeited upon breach of the agreement. Such a purchaser indicates real interest in the development. Pre-sales of more than half of the units offered indicates real demand, and

justifies the risk of extending financing to the developers.[11]

Appellants entered into a scheme essentially to fabricate the requisite pre-sales. They deliberately misrepresented their pre-sale purchasers as third parties who genuinely sought to buy the units contracted for, knowing all the while that the pre-sales were not sales at all but paper transactions with straw purchasers. In order to convict appellants of bank fraud, the government was required to prove that they intended to defraud Freedom. *United States v. Moede,* 48 F.3d 238, 241 (7th Cir.1995). There is more than ample record evidence to support this conclusion.

Finally, appellants argue that under *United States v. Brown,* 79 F.3d 1550 (11th Cir.1996), Freedom had a duty to inquire about the "bona fides" of their purchasers. Appellants cite *Brown* for the proposition that a party is not defrauded if a person of ordinary prudence could have confirmed the representations from readily available external sources. *Id.* at 1559. They argue that Freedom could have called any of the pre-sale purchasers listed on the status reports appellants submitted to it and discovered all the side agreements between appellants and their purchasers.

*Brown* does not apply to this case. In *Brown,* a developer misrepresented the value and potential rental income of its homes to customers. We noted that there was no fiduciary duty between these parties such that the developer had an affirmative duty to disclose alternative pricing structures. *Id.* We held that persons

---

[11]If Twitty had been telling the truth about having already presold thirty-nine of the forty-two condominiums to be built (at $175,000 per condominium), the developers would have been able to pay off $6.2 million of the construction loan as soon as they completed the project.

of ordinary prudence should not, therefore, have relied upon these representations.

The circumstances of this case are quite different. Here appellants have affirmatively misrepresented their compliance with a series of requirements established by their lender as a condition for the loan. A lender in such a circumstance is entitled to rely on the representations of the applicant even though no fiduciary relationship exists. *See Pelletier v. Zweifel,* 921 F.2d 1465, 1498-99 (11th Cir.1991). We reject this extension of *Brown.*

C. *The Restitution Issue*

The Victim and Witness Protection Act, 18 U.S.C. §§ 3663-3664 authorizes restitution to victims of crimes and specifically directs a sentencing judge to consider not only the victim's injury, but also "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." § 3664(a); *see also United States v. Barnette,* 10 F.3d 1553, 1556 (11th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 74, 130 L.Ed.2d 28 (1994). The district court must evaluate the defendant's financial condition and ability to pay before determining the restitution amount. *United States v. Cobbs,* 967 F.2d 1555, 1558 (11th Cir.1992); *United States v. Stevens,* 909 F.2d 431, 435 (11th Cir.1990). Restitution orders must be "in accordance with sections 3663 and 3664." 18 U.S.C. § 3556; *Barnette,* 10 F.3d at 1556.

Although Watson, Leveritt, and Larrison did not contest their ability to pay restitution at sentencing, they, along with Twitty,

challenge the restitution orders on appeal. Appellants claim that the restitution orders are defective because they are not sufficiently supported by findings of fact on the record regarding each appellant's ability to pay. We review a district court's restitution order for abuse of discretion. *United States v. Husky,* 924 F.2d 223, 225 (11th Cir.), *cert. denied,* 502 U.S. 833, 112 S.Ct. 111, 116 L.Ed.2d 81 (1991).

Freedom's loss as a result of appellants' failure to repay their loan amounted to approximately $15 million dollars, not including interest. The RTC recovered $3.7 million from the foreclosure sale. [12] The district court ordered each of the defendants to pay restitution of $11.3 million. This calculation of the amount of the loss was fair to the defendants. *See United States v. Norris,* 50 F.3d 959 (11th Cir.1995).

District courts are not obligated to make explicit factual findings of a defendant's ability to pay restitution if the record provides an adequate basis for review. *United States v. Hairston,* 888 F.2d 1349, 1352-53 (11th Cir.1989); *accord United States v. Lombardo,* 35 F.3d 526, 529-30 (11th Cir.1994). Conversely, "we will not uphold the district court's exercise of discretion if the record is devoid of any evidence that the defendant is able to

---

[12] We reject appellants' argument that their settlement with the RTC in which they were absolved from future liability for the claims which were the subject of the civil suit precludes any restitution order in this case. "Restitution is not a civil matter; it is a criminal penalty meant to have strong deterrent and rehabilitative effect." *United States v. Hairston,* 888 F.2d 1349, 1355 (11th Cir.1989). While a victim's receipt of partial compensation should be considered by the trial court in forming the restitution order, it does not preclude the criminal court from ordering restitution. *Id.*

satisfy the restitution order." *United States v. Remillong,* 55 F.3d 572, 574-75 (11th Cir.1995) (quoting *United States v. Patty,* 992 F.2d 1045, 1052 (10th Cir.1993)).[13]  "If the record is insufficient, reasons must be assigned." *Hairston,* 888 F.2d at 1353 (quoting *United States v. Patterson,* 837 F.2d 182, 183-84 (5th Cir.1988)).

Here, the district court did consider the requisite factors before ordering restitution.  Prior to sentencing these defendants, the district court recited that it had reviewed and considered the information in each defendant's Presentence Report (PSR), which detailed the amount of the loss sustained by the victim, the defendant's financial resources, and other factors enumerated in Sections 3663-3664 as appropriate for the court to consider when imposing restitution.[14]

Further findings are not required in this case because the record provides an adequate basis for review of the restitution orders.  *Remillong,* 55 F.3d 574-75.  The PSRs affirmatively demonstrate that appellants are educated, experienced in business or the practice of law, and have the likelihood of future

---

[13]Although Larrison, Leveritt, and Watson did not dispute their ability to pay restitution, the district court retains an obligation to consider the defendant's ability to pay before ordering restitution.  *Remillong,* 55 F.3d at 574.

[14]Twitty did contest his ability to pay restitution.  A defendant who disputes his ability to pay restitution bears the burden of demonstrating his financial resources by a preponderance of the evidence.  18 U.S.C. § 3664(e);  *Remillong,* 55 F.3d at 575.  He did not, however present any evidence at all of his financial resources or lack of future ability to pay.  As a result, the district court was entitled to rely on the uncontested facts contained in Twitty's PSR.

employment.[15]

A defendant claiming that the district judge failed to consider a mandatory sentencing factor under Sections 3663-3664 must show either that (1) it is not improbable that the judge failed to consider the mandatory factor and was influenced thereby, or (2) the judge explicitly repudiated the mandatory factor. *Remillong,* 55 F.3d at 576 (citing *United States v. Murphy,* 28 F.3d 38, 41 (7th Cir.1994)). The record affirmatively indicates that the district court did consider appellants' ability to pay. Appellants have not demonstrated that, despite the district court's announcement that it had considered the information in the PSRs, it is not improbable that he failed to consider their ability to pay. Therefore, the district court did not abuse its discretion in ordering restitution. *See Barnette,* 10 F.3d at 1556.

---

[15]The PSRs contained the following information supporting the orders of restitution: Watson had practiced law since 1964. His suspension from the practice of law is only three years. Although he reported his net worth at $84,689, he has sold his home for 675,000 and paid off all debts. He has liquefiable assets, and the ability to earn substantial income in the future. He has no children to support. He received no incarceration.

Leveritt operated his own financial company, preparing tax returns and providing advice. Although indebted now, he was very successful for twenty years in business, demonstrating the ability to earn substantial future income. He has no children to support. He received no incarceration.

Larrison has also been very successful in business, working as a consultant and commercial real estate investor. He has owned and operated several businesses. At the time of sentencing, he had a small negative monthly cash flow. He received eighteen months incarceration.

Twitty is a licensed real estate broker who made enough money to invest millions in real estate ventures. He would be expected to have that ability in the future. He received eighteen months incarceration.

## III. CONCLUSION

We hold that the indefinite continuance granted by the district court served to exclude sufficient time from the speedy trial clock so that trial in this case began within the statutory period.  We hold there was no Sixth Amendment violation.  We hold that the evidence at trial was sufficient to support the convictions returned by the jury.  Finally, we hold that the district court did not abuse its discretion in ordering restitution.  Accordingly, we

AFFIRM.